**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Roy L. WILLIAMS, Thomas F. O'Malley, Andrew G. Massa, Joseph Lombardo, Defendants-Appellants.**

Nos. 83–1642 to 83–1644, 83–1660, 83–2206 to 83–2208 and 83–2229.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 5, 1984.

Decided June 8, 1984.

As Amended June 11, 1984.

Rehearing and Rehearing En Banc Denied July 12, 1984.

Frank Oliver, Northfield, Ill., Nathan Lewin, Miller, Cassidy, Larroca & Lewin, Washington, D.C., William G. Hundley, Hundley & Cacheris, Washington, D.C., for defendants-appellants.

William C. Bryson, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before ESCHBACH, POSNER and COFFEY, Circuit Judges.

ESCHBACH, Circuit Judge.

Roy Williams, Joseph Lombardo, Thomas O'Malley, and Andrew Massa appeal from convictions on all 11 counts of an indictment charging conspiracy to bribe a United States Senator, 18 U.S.C. § 371, interstate travel to promote the bribery, 18 U.S.C. § 1952, and wire fraud, 18 U.S.C. § 1343. Only Lombardo attacks the sufficiency of the evidence. All defendants, however, contend that the district court erred (1) in denying a motion to suppress evidence obtained through electronic surveillance, (2) in ruling on several evidentiary matters, (3) in handling ex parte juror contacts, (4) in instructing the jury, and (5) in denying a request for a new trial. Finding no merit in these contentions, we affirm.

I.

Many aspects of this case are extraordinary. For instance, the trial lasted nearly two months, and the jury charge an hour

and a half. Moreover, the parties made over 200 written motions to the district court, which gave each motion individual attention. Amid this complexity, the government's theory of criminal culpability is strikingly clear: the defendants, Allen Dorfman,[1] and William Webbe, an unindicted co-conspirator, devised and pursued a scheme to bribe a United States Senator at the expense of the Teamsters' Central States Pension Fund.[2] Viewing the evidence in the government's favor, *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we now describe the events that support this charge and the defendants' convictions.

The Teamsters' Central States Pension Fund ("Pension Fund" or "Fund") is an organization created by and funded pursuant to collective bargaining agreements between the Teamsters Union and employers. As the name implies, the Pension Fund pays benefits to retired union members. In 1972, the Pension Fund acquired what is known as the Wonderworld property—a 5.8 acre plot of land in Las Vegas, Nevada. The Pension Fund, however, lost direct control over the management and disposition of this property in 1977, when the Victor Palmieri Company ("Palmieri") was retained to manage the Fund's real estate assets. The Pension Fund's trustees, as part of an effort to retain the Fund's tax-exempt status, relinquished managerial control to Palmieri and retained only the right to monitor Palmieri and to remedy breaches of fiduciary duties.

In 1978, when Palmieri decided to sell the Wonderworld property, nearby homeowners became concerned that a high-rise building would be constructed on the land. The homeowners thus organized and selected as their spokesman Senator Howard Cannon, whose home was across the street

from the Wonderworld property. The group decided to purchase the land with a view toward having the property "downzoned." At a homeowners' meeting, Senator Cannon offered to call Allen Dorfman to discover whether the group could buy the property directly from the Pension Fund. At the time, Allen Dorfman was not formally associated with the Fund; however, his insurance company, which had offices in the same building that housed the Pension Fund, previously insured many of the Fund's assets. Senator Cannon also suggested that his son-in-law, Robert Bjornsen, could serve as the group's agent for the Wonderworld transaction. The homeowners agreed and Bjornsen initiated contacts with Palmieri in late December of 1978.

On January 8, 1979, Palmieri invited sealed bids from parties who had expressed interest in the Wonderworld property. The bid-solicitation letter stated several conditions, including that the minimum bid was $1,400,000. Before Bjornsen submitted a bid on behalf of the homeowners, however, Senator Cannon met in his Las Vegas office with Allen Dorfman, Roy Williams, then an international vice-president of the Teamsters Union,[3] and Edward Wheeler, a lawyer who represented the Teamsters on legislative matters.

At this meeting, which occurred on January 10, 1979, Wheeler voiced the Teamsters' objections to the deregulation of the trucking industry—a nascent proposal in Congress. After he completed his presentation, Wheeler heeded Williams' request and left the Senator's office. Williams, Dorfman, and Senator Cannon continued to meet for another 25 to 45 minutes. The three men discussed the Wonderworld property and the homeowners' effort to

---

**1.** Dorfman was named, and found guilty as charged, in all counts of the indictment. He was murdered prior to sentencing and the case against him was dismissed as moot. In this opinion, the term "defendants" will refer to the appellants, not Dorfman.

**2.** The full name of this entity is "Central States, Southeast and Southwest Areas Pension Fund."

**3.** Roy Williams subsequently became the international president of the Teamsters, but resigned that position as a condition to remain free pending appeal. *See United States v. Williams*, 565 F.Supp. 350, 353 n. 1 (1983).

purchase the land. Williams and Dorfman, seeking to influence Senator Cannon's actions and decisions on the deregulation legislation, offered the Senator and his group the exclusive right to purchase the Wonderworld property at a price of $1,400,000. Over the next four months, the defendants, Allen Dorfman, and Dorfman's associate William Webbe, worked to keep this promise.

Robert Bjornsen, on behalf of the homeowners, submitted to Palmieri a $1,400,000 bid on January 12, 1979. The bid, however, was rejected for failure to conform to Palmieri's requirement of full payment within one year. Palmieri also rejected a $1,600,-000 bid from investor Allen Glick because he failed to submit the requisite personal-finance statement. Receiving no complying bids, Palmieri decided to pursue further negotiations with Bjornsen, the homeowners' agent, and Glick, the high bidder.

Palmieri and Glick appeared to reach an agreement. Glick orally made a new offer for $1,600,000 and agreed to raise the down payment from $400,000 to $800,000. On January 29, 1979, a Palmieri representative accepted this offer and closing documents were mailed to Glick's attorney. Before the purchase agreement was executed, however, Glick withdrew his offer.

A concerted effort by the four defendants led to Glick's withdrawal. Early in the afternoon on January 30, 1979, Joseph Lombardo, whose vocational status is something of a mystery, made a proposal to Allen Dorfman to send people from the Pension Fund to speak with Glick. In particular, Lombardo named as emissaries Thomas O'Malley, then a trustee of the Fund, and Andrew Massa, a former trustee. Roy Williams approved the trip and made an airplane available to O'Malley and Massa.

Later that same day, O'Malley and Massa did fly to California to meet with Glick. During a dinner meeting, O'Malley and Massa frankly described their intentions. They told Glick that a homeowners' group headed by Senator Cannon wanted to buy the Wonderworld property. The two men further informed Glick that there was legislation pending before a Senate committee chaired by Senator Cannon that would harm the trucking industry and that they wanted the legislation defeated. To secure Senator Cannon's appreciation, therefore, O'Malley and Massa asked Glick to withdraw his $1,600,000 offer. Glick readily agreed to withdraw the outstanding offer, but made it known that his partner, Fred Glusman, might wish to continue his own efforts to purchase the property.

The next day Glick withdrew the offer on the Wonderworld property and suggested to Glusman that he refrain from individually pursuing the land. From the conspirators' point of view, therefore, prospects appeared promising on February 9, 1979, when Bjornsen submitted another offer on behalf of the homeowners. The purchase offer was again for $1,400,000 and included a sizeable commission to be paid to Bjornsen's company. Undeterred by Glick's suggestion, however, Glusman made an offer for $1,600,000. Accordingly, the homeowners' offer was rejected and Palmieri proceeded to close the deal with Glusman.

Before the deal was completed, Glusman was again contacted by Glick who told Glusman not to "fight city hall." Evidently not prepared for such a contest, Glusman withdrew his offer on February 15, 1979. Thus by the beginning of March, the slate was clean and Palmieri resumed negotiations with Bjornsen.

By that time, however, it seemed plain that the Wonderworld property would be "down-zoned"; consequently, the homeowners' group lost interest in buying the property and disbanded. Dorfman and Webbe, determined to keep a promise made to Senator Cannon, then helped Bjornsen find a new partner for the desired purchase—Robert L. Smith, who was a Las Vegas contractor and business associate of Dorfman. Bjornsen submitted a series of three bids on behalf of "Robert L. Smith"; each was for $1,400,000 and each was rejected by Palmieri for providing an insufficient down payment. Throughout this final stage of the conspiracy, Dorfman and

Williams lamented their inability to fulfill the commitment made to Senator Cannon. Yet as late as May 21, 1979, Dorfman assured the Senator that the deal was still "wide open."

On May 25, 1979, Palmieri accepted American National Development Corporation's offer to purchase the Wonderworld property for $1,600,000. On July 2, 1979, the property was sold to that corporation.

On May 22, 1981, the defendants were charged in all counts of an 11-count indictment. Count I charged the defendants with a conspiracy to bribe a United States Senator, 18 U.S.C. § 371. Count II charged the defendants with causing O'Malley and Massa to travel in interstate commerce to California, with the intent to promote the bribery, 18 U.S.C. § 1952. Counts III to XI charged the defendants with the use of interstate wires for the purpose of executing a scheme to defraud the Pension Fund of its "right to the conscientious, loyal, faithful, disinterested, and unbiased services of Thomas F. O'Malley," 18 U.S.C. § 1343.

The district court denied the defendants' motions to dismiss the indictment, *see United States v. Dorfman*, 532 F.Supp. 1118 (1981), and to suppress evidence obtained through electronic surveillance, *see United States v. Dorfman*, 542 F.Supp. 345 (1982). A jury trial was held and the defendants were found guilty as charged in all counts of the indictment. Williams received the maximum sentence of 55 years in prison, but this sentence was imposed pursuant to 18 U.S.C. § 4205(c) to permit a study of Williams' health. The district court indicated that when the study is complete, Williams' sentence will be reduced. Lombardo was sentenced to a prison term of 15 years, O'Malley to a term of 30 months, and Massa to one year.

## II.

The government's evidence at trial consisted in large measure of conversations surreptitiously intercepted and recorded pursuant to court orders and the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 to 2520 ("Title III"). The defendants, blending constitutional and statutory arguments, maintain that this evidence was illegally obtained and introduced at trial. Before we address these arguments, however, we briefly describe the government's electronic investigation.

## A.

On January 29, 1979, the government, through a special attorney for the Department of Justice, applied for Title III authority to place a wiretap on telephones at the Amalgamated Insurance Agency, which was Dorfman's place of business. The application stated that there was probable cause to believe that Dorfman and others were illegally "conspiring to establish, promote, manage, and/or receive compensation from hidden interests in one or more Reno and Las Vegas, Nevada, gambling casinos." 542 F.Supp. at 370. The application, which was made to the Chief Judge of the United States District Court for the Northern District of Illinois, was supported by an affidavit of FBI Special Agent Peter Wacks. Wacks' affidavit, in turn, was based on reports from six confidential informants and one James Fratianno. The Chief Judge granted the application and the surveillance commenced.

The initial surveillance order expired after 30 days; thus on March 1, 1979, the government applied to the district court for authority to continue intercepting telephone calls. This application repeated the initial allegations concerning hidden interests in casinos. The application, however, added the Aladdin hotel-casino to the list. This new allegation was made in an affidavit of Special Agent Wacks and supported by transcripts of conversations intercepted pursuant to the initial court order. The Chief Judge granted the March 1, 1979, application and authorized 30 more days of wiretaps.

A series of 30-day authorizations followed throughout 1979 and into 1980. Not until the application of April 28, 1979, did the government allege that Dorfman and

others were involved in a conspiracy to bribe Senator Cannon. We close this brief history by noting that on April 7, 1979, the government obtained its most effective Title III authority—a court order that permitted the placement of electronic-listening devices in the offices of Dorfman and William Webbe.

The defendants have brought up from the district court's suppression proceedings essentially two arguments. First, they assert that the government's March 1, 1979, application did not satisfy Title III's requirements and, in any event, was supported by an affidavit containing a deliberate or reckless misrepresentation. Second, they contend that the Fourth Amendment required the suppression of conversations recorded prior to April 28, 1979, when the government first alleged the existence of a conspiracy to bribe Senator Cannon. We now consider, and ultimately reject, these positions.

### B.

■ The government supported its March 1, 1979, Title III application with the same allegations and probable-cause showing made to obtain the original surveillance order. An extension application is not complete, however, if it only duplicates the original submission. The authorizing judge must be sufficiently informed about the results of the prior interceptions to answer intelligently the question whether probable cause exists to believe relevant conversations will be intercepted in the future. Accordingly, 18 U.S.C. § 2518(1)(f) requires that the extension application contain a statement of results previously obtained, or an explanation of the failure to obtain results. Ruling on the defendants' motion to suppress, the district court held that the government's application of March 1, 1979, "did not contain the required explanation." 542 F.Supp. at 374.

■ The government asserts that the district court overlooked a statement in the

March 1, 1979, application that "[d]uring the entire period of this court's order for the interception of wire communications, the main subject of the investigation, Allen Dorfman, was out of the State of Illinois." In the government's view, this declaration is a "reasonable statement of the failure to obtain ... results," 18 U.S.C. § 2518(1)(f).

There is good reason to doubt that the brief reference to Dorfman's absence was sufficient to satisfy 18 U.S.C. § 2518(1)(f). For instance, the statement was made in the context of (incorrectly) asserting that conversations relating to the January 29, 1979, allegations had been intercepted. We would thus hesitate to hold that the government's application fairly explained the results of prior surveillance to allow an intelligent probable-cause determination. We need not so hold, however, because the March 1 application was not founded solely on a renewal of the initial (January 29) allegations.

As we noted above, allegations concerning the Aladdin hotel-casino were made first in the March 1 application. Special Agent Wacks alleged in his affidavit that the FBI had intercepted conversations pursuant to the January 29 wiretap order that "concerned the promotion and management of hidden and unlawful interests in the Aladdin hotel-casino." Wacks provided the court with transcripts of the conversations, biographical information on the participants, and the meaning of certain veiled references.

Wacks' allegations and the transcripts of conversations formed an ample basis for the Chief Judge's probable-cause finding under § 2518(3).[4] The one-month-old allegations concerning other casinos were surplus, and any failure to explain the lack of intercepted calls to substantiate the January 29 allegations was rendered immaterial. Apart from the purportedly inadequate § 2518(1)(f) explanation, the defendants cite, and we have discovered, no other stat-

---

**4.** In a footnote the defendants assert that the March 1 materials did not establish probable cause. For the reasons expressed by the district

court, *see* 542 F.Supp. at 375–76, we disagree. *See also infra* pp. 602–603.

utory deficiency in the government's March 1 submissions. All predicates for a Title III order were thus satisfied and the Chief Judge properly issued the wiretap authorization.

The Supreme Court's decision in *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), which is cited by the defendants, does not compel a contrary conclusion. The Court in that case suppressed evidence intercepted under a Title III extension order because the extension was dependent on evidence illegally obtained pursuant to an initial order. The instant case, by contrast, involves only valid orders issued on applications meeting Title III's requirements. There is no basis for invoking the suppression remedy to punish the government for a deficient (if it was) § 2518(1)(f) statement, which was inessential to the showing of probable cause and the issuance of the March 1 wiretap order.

Special Agent Wacks' allegation in his March 1 affidavit that conversations were intercepted concerning the "promotion and management of hidden and unlawful financial interests in the Aladdin hotel-casino" proved to be false. The conversations allegedly involving the Aladdin hotel-casino turned out to involve the defendants' and Allen Dorfman's efforts to direct the Wonderworld property to the homeowners' group headed by Senator Cannon. The defendants use this misrepresentation as their primary weapon in the attack on evidence intercepted pursuant to the March 1 wiretap order.

■ In challenging Wacks' affidavit in the district court, the defendants' task was defined by *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978): they had to prove that the Aladdin allegations were intentional lies or made with reckless disregard for the truth.[5] *See also United States v. Gaertner*, 705 F.2d 210, 212 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 979, 79 L.Ed.2d 216 (1984). We know what inten-

tional lies are, but the meaning of "reckless disregard for the truth" is not self-evident, and the Court in *Franks* did not define the concept. We do know, however, that recklessness is not negligence, *see Franks*, 438 U.S. at 171, 98 S.Ct. at 2684, and that the Court has clarified the notion of reckless disregard in the context of First Amendment cases involving libel. We thus agree with the District of, Columbia Circuit, *see United States v. Davis*, 617 F.2d 677, 694 (1979), that the First Amendment definition should be applied by analogy in the *Franks* setting. Accordingly, to prove reckless disregard for the truth, the defendants had to prove that the affiant "in fact entertained serious doubts as to the truth of his" allegations. *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Because states of mind must be proved circumstantially, a factfinder may infer reckless disregard from circumstances evincing "obvious reasons to doubt the veracity" of the allegations. *See id.* at 732, 88 S.Ct. at 1326.

■ The district court held an extensive evidentiary hearing, applied the correct legal standards, and found that the defendants "failed to demonstrate that the incorrect March 1 Aladdin allegations were either intentional misrepresentations, or made with reckless disregard for the truth." *United States v. Dorfman*, 542 F.Supp. at 381. We may disturb this finding only if, after a review of the record, we find it clearly erroneous. *See United States v. Wuagneux*, 683 F.2d 1343, 1355 (11th Cir.1982), *cert. denied*, —— U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *United States v. Lefkowitz*, 618 F.2d 1313, 1317 (9th Cir.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 27 (1980); *United States v. Cruz*, 594 F.2d 268, 272 (1st Cir.), *cert. denied*, 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979).

A review of conversations intercepted pursuant to the January 29 wiretap order demonstrates that the government's Alad-

---

5. A challenged statement must also be material in the sense that without it, no probable cause was established. The Aladdin allegations fit this definition of materiality.

din allegations were not manufactured from whole cloth. On January 31 and February 1, the government intercepted communications between one "Sandy" and David Dorfman, Allen Dorfman's son and associate. On January 31, the two discussed an attempt being made by Colonial Commercial Credit Corporation to refinance the Aladdin hotel-casino. They expressed concern about a competing refinancing proposal and a mysterious "source" of funds. The conversation intercepted on February 1 indicates that Sandy talked about the Aladdin with Allen Dorfman, who stated that the "deal" was "dead," but who still planned a future meeting regarding the matter.

Beginning on January 30, and continuing throughout February, the government also intercepted calls concerning a "bid" on a piece of property. Allen Dorfman, Joseph Lombardo, William Webbe, and another person were overheard on January 30 talking about sending Thomas O'Malley and Andrew Massa to speak with an unnamed person about a "bid" that they wanted "handled." In a series of calls that followed, the government learned more about the handling of this bid: a man named Glick was the bidder on the property and Allen Dorfman succeeded in securing Glick's withdrawal. The government further learned on February 13 that a bid had been rejected by "Palmieri."

The conversations by themselves could have led a reasonable person to conclude that Allen Dorfman and his associates were involved in an effort to acquire, promote, or manage a hidden interest in the Aladdin hotel-casino. And Special Agent Wacks' investigation revealed further facts to support such a thesis. He learned that the "Glick" in the conversations was Allen Glick, the president of Argent Corporation, which owned several Las Vegas hotel-casinos. Wacks also learned that "Palmieri" was a firm that managed the Pension Fund's real estate assets, that the Pension Fund made loans to and had an interest in the Aladdin, and that O'Malley and Massa were Pension Fund officials. In light of the confluence of factors pointing to the Aladdin hotel-casino, and deferring to the district court's opportunity to observe the testimony of Special Agent Wacks and other investigators, we cannot term clearly erroneous the finding that the government's March 1 Aladdin allegations were not intentional or reckless misrepresentations.

The defendants primarily point to two items as compelling a contrary result. First, they note that Special Agent Wacks erroneously stated in his March 1 affidavit that conversations substantiating the original January 29 allegations had been intercepted. The district court, however, accorded this fact "marginal probative value," 542 F.Supp. at 381 n. 37, and we will not reweigh the evidence on appeal. Second, the defendants accord great significance to the fact that by March 1, Special Agent Wacks and other investigators knew that the "bid" referred to in the conversations was not on the Aladdin but, rather, on some "golf course" property. The March 1 affidavit, however, did not state that the bid was on the Aladdin. The government gave the Chief Judge the transcripts and only alleged that the conversations "concern" a hidden interest in the Aladdin hotel-casino. This language is consonant with the investigators' view that somehow the machinations involving the "golf course" property also concerned a hidden interest in the Aladdin. Nothing in the transcripts is inconsistent with this view and, given the veiled nature of the discussions, the government could hardly be expected to have defined the connection more explicitly. Finally, two additional pieces of evidence support the finding that the investigators truly believed a link existed between all the conversations contained in the March 1 application: summaries of the "bid" conversations were coded into FBI files on both the Aladdin and "golf course" properties; and a telegram sent from the FBI's Chicago office to the Director on February 14, 1979, stated that the "bid" calls "relate to" the Aladdin.

The defendants argue, nevertheless, that the government was constitutionally ob-

liged to make a "complete and total disclosure" to the Chief Judge. Accordingly, they conclude, the government's failure to inform the Chief Judge that the "bid" in the conversations was not directly on the Aladdin mandates suppression.

■ We acknowledge that the rationale of *Franks* applies to omissions and that several courts have permitted litigants to challenge affidavits on the ground that facts were omitted.[6] *See, e.g., United States v. Lefkowitz,* 618 F.2d 1313, 1317 (9th Cir.), *cert. denied,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 27 (1980); *United States v. Vazquez,* 605 F.2d 1269, 1282 (2d Cir.), *cert. denied,* 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979); *United States v. House,* 604 F.2d 1135, 1141 (8th Cir. 1979), *cert. denied,* 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980); *United States v. Lace,* 502 F.Supp. 1021, 1046 (D.Vt.1980). These courts recognize, however, that the omitted fact must be material—that is, if the fact were included, the affidavit would not support a finding of probable cause. *See Lefkowitz,* 618 F.2d at 1317; *Vazquez,* 605 F.2d at 1282; *House,* 604 F.2d at 1141. It is further plain that if the challenger is permitted to marshal all exculpatory facts, fairness dictates that the government be allowed to support the affidavit with additional inculpatory information known to the affiant at the time the affidavit was made. *Cf.* 2 W. LaFave, *Search and Seizure* § 4.4, at 20 (Supp.1983).

Judging the omission in this case by these standards, we hold that the omission did not reach the level of constitutional materiality. The transcripts included in the March 1 affidavit reveal that the "bid" was for $1,600,000. A reasonable judge would recognize that this figure is too low to be a direct offer to purchase the Aladdin hotel-casino; thus the bid and the Aladdin must, at best, be indirectly connected. Consequently, the omitted fact—that the bid was not on the Aladdin—was of marginal value and constitutionally insignifi-

cant when measured against the substantial evidence linking the bid conversations and the Aladdin, *see supra* pp. 602–603.

### C.

The defendants mount a broader and more creative challenge to the admissibility of 33 conversations intercepted prior to April 28, 1979, when the government first alleged in a Title III application a conspiracy to bribe Senator Cannon. The challenge is founded on the Fourth Amendment's requirement that a search warrant "particularly describ[e] the place to be searched, and the ... things to be seized." Before we address the heart of this argument, however, we must describe what the defendants are not challenging.

The defendants do not find unconstitutionally vague either the government's Title III applications or the Chief Judge's orders. Indeed, Congress requires in Title III that every application contain information detailing the offense under investigation, the nature and location of the property where the interception is to occur, the type of conversation sought to be intercepted, and the persons thought to be committing the alleged offense. *See* 18 U.S.C. § 2518(1)(b)(i)–(iv). In addition, any order authorizing interception must contain "a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates." *Id.* § 2518(4)(c).

■ Similarly, the defendants do not assert that the government violated constitutional or statutory law in overhearing and recording the 33 challenged conversations. Section 2518(5), which finds its roots in the Fourth Amendment, mandates that "[e]very order and extension thereof ... shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." Government agents, however, "can hardly be expected to know

---

**6.** Such a *Franks* challenge is predicated, of course, on proof that the omission was made intentionally or with reckless disregard. *See*

*United States v. Martin,* 615 F.2d 318, 329 (5th Cir.1980).

[which] calls are not pertinent prior to their termination." *Scott v. United States*, 436 U.S. 128, 140, 98 S.Ct. 1717, 1724, 56 L.Ed.2d 168 (1978). When the investigation is of a suspected large-scale conspiracy, and when the suspects speak in veiled terms, the government is justified in intercepting conversations that eventually prove to be without the scope of the Title III authorization. *See id.* at 140–41, 98 S.Ct. at 1724–25; *United States v. Quintana*, 508 F.2d 867, 874 (7th Cir.1975); *United States v. James*, 494 F.2d 1007, 1019 (D.C. Cir.), *cert. denied*, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974).

The defendants do make a distinction between intercepting conversations and using conversations as evidence in a criminal prosecution. Noting that the government was authorized to search for evidence of hidden interests in casinos, but intercepted 33 conversations relating to different charges, they argue that "conversations that have been 'seized' out of necessity in recorded form ... must be embargoed and thereafter made unavailable to the investigating government agents." The constitutional infirmity arose, in the defendants' view, not when the conversations were recorded, but when the government made investigative and evidentiary use of the conversations.

The defendants must, to succeed in this argument, surmount the obstacle of the "plain view" doctrine, which authorizes the seizure of evidence not described in a warrant. To this end, the defendants note that an item in plain view may be seized only if there is probable cause to believe that the item is evidence of criminality, *see Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). Their argument concludes with a review of the 33 conversations, which the defendants describe as facially innocuous.

The defendants' rigid application of traditional search-and-seizure principles is ironic; surely it is inconsistent to demand a flexible interpretation of the Fourth Amendment to afford some constitutional limits on the interception of conversations, and then to insist on a rigid reading when the needs of effective law enforcement are considered. Irony aside, we believe that it is evident that the defendants would have us apply a "plain view" principle—i.e., only items apparently evidence of a crime may be seized—in a manner never intended by the Supreme Court. The principle defines permissible seizures, not permissible uses of items lawfully seized. But as noted above, the defendants do not challenge the initial recording (search and seizure) of the 33 conversations, only the government's use of the evidence. Moreover, there is good reason to doubt that the plain view doctrine, as currently developed, should be applied to electronic interceptions of conversations. The plain view doctrine is concerned about the Fourth "Amendment's limitations upon seizures of personal property," whereas the interceptions in this case might be thought of as more like an "officer's observation of an item left in plain view, [which] involves no Fourth Amendment search." *Texas v. Brown*, 103 S.Ct. at 1541 n. 4.

Were we to apply traditional search-and-seizure principles in this case, we could note that an officer performing a lawful search may, on "reasonable suspicion," conduct closer examination of an item in plain view, *see United States v. Wright*, 667 F.2d 793, 797–98 (9th Cir.1982); if by the end of the search there is probable cause to believe that the item is evidence of a crime, it may be seized. *See United States v. Schire*, 586 F.2d 15, 19 (7th Cir. 1978). We could also note that the 33 challenged conversations are "suspicious" and that the government's Title III search continued long after the criminal character of the conversations was known. Accordingly, we could hold that the conversations were properly seized and used by the government. This reasoning, however, is just as artificial and inappropriate as the defendants' analysis. A more sensitive, less doctrinaire, inquiry is required.

The basis of modern Fourth Amendment law is the Supreme Court's understanding of "the right to privacy." *See Oliver v.*

*United States,* — U.S. —, —, 104 S.Ct. 1735, 1740, 80 L.Ed.2d 214 (1984). The defendants suggest that the maintenance of a "library ... of recordings of conversations" is a practice of constitutional concern apart from the initial interception (overhearing) of the communications. Stripped to its core, therefore, the defendants' argument is that the Fourth Amendment prevents the government from reviewing lawfully recorded conversations for evidence of a charge not alleged in the Title III application.

■ We find little merit in this argument. It is settled that "once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost." *Illinois v. Andreas,* — U.S. —, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983). Moreover, it has long been clear that "[p]rotecting the risk of misdescription hardly enhances any legitimate privacy interest," *United States v. Jacobsen,* — U.S. —, 104 S.Ct. 1652, 1659, 80 L.Ed.2d 85 (1984); thus a government agent may constitutionally record conversations lawfully overheard. *See Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963). The nature of the privacy interest assertedly harmed by the government's review of conversations lawfully recorded, therefore, is difficult or impossible to define.

■ We need not rule that, in all cases, the government may review its "library of conversations" to corroborate charges not made before the Title III authorizing court. But in a case of a continuing investigation such as this, in which the government's review of the conversations promptly ripened into formal allegations justifying further Title III orders, we cannot conclude that the government's conduct was unreasonable and consequently unconstitutional.

Finally, we note that Title III itself has a mechanism to limit and assure the reasonableness of the government's use of other-crimes evidence. Section 2517(5) provides that before evidence can be used in the prosecution of an offense different from the one named in the original application, a separate application must be made to the court. *See generally United States v. Brodson,* 528 F.2d 214, 215 (7th Cir.1975). The application must be "made as soon as practicable," § 2517(5), and judicial approval requires "a showing that the original order was lawfully obtained, that it was sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order." S.Rep. No. 1097, 90th Cong., 2d Sess. 66, *reprinted in* 1968 U.S.Code Cong. & Ad. News 2112, 2189; *see United States v. Vento,* 533 F.2d 838, 855 (3d Cir.1976). The defendants do not raise a § 2517(5) argument on appeal.

### III.

The defendants raise a variety of evidentiary arguments. They assert that the district court erred in admitting as substantive evidence portions of William Webbe's grand-jury testimony and in finding that statements made at a meeting in Dorfman's office on May 21, 1979, were in furtherance of the conspiracy to bribe Senator Cannon.

### A.

As we stated in Part I of this opinion, Allen Dorfman's associate and employee William Webbe played a central role in the conspiracy to bribe Senator Cannon. Webbe escaped prosecution, however, because he was granted immunity and compelled to testify before the grand jury and at trial. A synopsis of some of that testimony is needed to understand the defendants' first evidentiary argument.

During the first day of his grand-jury testimony, it became clear that Webbe was a recalcitrant witness unwilling to confirm information that the government learned from its electronic investigation. The prosecutor, nevertheless, focused on the January 10, 1979, meeting in Las Vegas between Senator Cannon, Allen Dorfman, and Roy Williams. Webbe, who waited outside the Senator's office during the meeting,

was asked what occurred when the three men emerged from the office. Webbe testified before the grand jury: "I got introduced to the Senator ... and that was it."

On the second day before the grand jury, Webbe was confronted with a recording of a conversation he had with Allen Dorfman and Don Peters on May 21, 1979. The conversation, which occurred in Dorfman's office, concerned the January 10 meeting with Senator Cannon in Las Vegas. The conversers were overheard saying:

> DORFMAN: Well, the only bad part about the whole thing see if we had said to him, well let's look into it, you know, because now it's really not under the custody and control of the fund anymore, and so on and so forth. But Roy Williams just unequivocally came right out and says, you got the property Senator, don't worry about it. It's our property, you own it. You got a commitment from him.
>
> WEBBE: You take care of your end.
>
> DORFMAN: And I turned to Roy, cause he verified it the other day, I said Roy, we made a firm commitment to this guy. This wasn't an if-come deal. I said if it's gonna be an if-come deal, you tell a guy it's an if-come deal, and he can conduct himself accordingly. I said, but we made a firm commitment. And even when we were walking out of his office, and after he said you know that, uh, I, uh, ... gee ... I hope I have a series of different items that he wanted, you know, to help him on the, on the deregulation. And then so on ... no, you were standing there.
>
> WEBBE: I was there.
>
> DORFMAN: And, uh, you'll have everything, and he says and you fellows will take care of that property thing? Don't worry about it's all taken care of.
>
> WEBBE: Roy said you take care of your end and we'll take care of our end for you.
>
> DORFMAN: That's right.

Confronted with this conversation and again asked what occurred when the January 10 meeting ended, Webbe testified before the grand jury: "I think they said, 'Bring up some points,' or something like that, 'or some ideas that you have,' ..."

On Webbe's fourth and last day before the grand jury, he was again confronted with the May 21 recording. The prosecutor then elicited the following testimony:

Q. Now, we have been over this a few times, Mr. Webbe, but just so I have it clear, isn't it fair to say that a summary of this conversation, so we all know what you talked about, was that upon exiting, Cannon indicated to Dorfman, "You fellows will take care of that property thing," and Allen replied, "Don't worry about it. It is all taken care of."

A. That's correct, sir.

Q. That is when Roy said, "You take care of your end, and we'll take care of ours," correct?

A. That's correct.

Q. Then the Senator went on and said about the deregulation, "You give me some of your input, and we can come around and work this thing out together."

A. Yes.

Q. And you are indicating, I believe, by "working this thing out together," that at that point in time it was your understanding that Senator Cannon was referring to deregulation.

A. Yes, sir, I think it was stated in that tape that they were talking about that.

This last quoted grand-jury testimony was introduced as substantive evidence at trial. It was admitted after Webbe testified at trial that, to the best of his memory, the only thing said when Williams and Dorfman left Senator Cannon's office on January 10 was the Senator's request for the others "to get back with some input on the deregulation." The defendants argue that Webbe's grand-jury and trial testimonies are consistent and thus the district court erred in admitting, pursuant to Federal Rule of Evidence 801(d)(1)(A), the grand-jury testimony as substantive evidence.

■ The principle of law embodied in Rule 801(d)(1)(A) appears clear on its face—a trial witness's grand-jury testimony is not hearsay (and admissible substantively) if it is inconsistent with his trial testimony. As long as people speak in nonmathematical languages such as English, however, it will be difficult to determine precisely whether two statements are inconsistent. But we do not read the word "inconsistent" in Rule 801(d)(1)(A) to include only statements diametrically opposed or logically incompatible. Inconsistency "may be found in evasive answers, ... silence, or changes in positions." *United States v. Dennis,* 625 F.2d 782, 795 (8th Cir.1980). In addition, a purported change in memory can produce "inconsistent" answers. *See United States v. Distler,* 671 F.2d 954, 958 (6th Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 118, 70 L.Ed.2d 102 (1981). Particularly in a case of manifest reluctance to testify, *see United States v. Thompson,* 708 F.2d 1294, 1302 (8th Cir. 1983), "if a witness has testified to [certain] facts before a grand jury and forgets ... them at trial, his grand jury testimony ... falls squarely within Rule 801(d)(1)(A)." *United States v. Marchand,* 564 F.2d 983, 999 (2d Cir.1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978). In view of the multitude of factors, a district court's ruling under Rule 801(d)(1)(A) will be disturbed only if an abuse of discretion. *See United States v. Distler,* 671 F.2d 954, 958 (6th Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 118, 70 L.Ed.2d 102 (1981).

■ We hold that the district court did not err, and did not abuse its discretion, in finding Webbe's trial and grand-jury testimonies inconsistent. At trial Webbe's memory of the January 10 conversation outside Senator Cannon's office was limited, vague, and not inculpatory. A fair reading of the admitted grand-jury testimony, by contrast, indicates that Webbe recalled Senator Cannon saying, "You fellows will take care of that property thing," and Dorfman replying, "Don't worry about it. It is all taken care of." The defendants attempt a reconciliation by asserting that Webbe's brief answers before the grand jury were not statements about what was said on January 10 but, rather, affirmations that the May 21 recording indicates that Senator Cannon and Dorfman made such remarks. Two items persuade us that the defendants are mistaken. First, the prosecutor's questions before the grand jury contain phrases such as "That is when Roy *said,*" and "Then the Senator went on and *said.*" [7] The prosecutor was not asking about what was heard on the May 21 tape, but what was "said" outside Senator Cannon's office. Second, Webbe's grand-jury testimony immediately prior to that introduced at trial confirms that Webbe was recalling the events of January 10, not the words on the May 21 recording:

Q. Mr. Webbe, on this tape you heard your voice acknowledge, did you not, the fact that Senator Cannon said, "And you fellows will take care of that property thing," and Alan [sic] saying, "Don't worry about it. It's all taken care of."

Did you hear that?

A. Yes, sir, I heard that.

Q. And that was also part of the conversation that occurred on January 10th as these three individuals exited Senator Cannon's office, isn't that true?

A. I believe it was.

Q. There's no doubt that as of that part of the conversation that Senator Cannon was referring to a piece of property which you came to learn was the Wonder World property, isn't that true?

A. That's correct, sir.

At times before the grand jury Webbe did, in fact, only acknowledge what he heard on the May 21 recording. The defendants have no basis, however, to assert that the grand-jury testimony read at trial

---

7. Answers are within Rule 801(d)(1)(A) even if elicited by means of leading questions. *United States v. Dennis,* 625 F.2d 782, 795 (8th Cir. 1980); *United States v. Champion International Corp.,* 557 F.2d 1270, 1274 (9th Cir.), *cert. denied,* 434 U.S. 938, 98 S.Ct. 428, 54 L.Ed.2d 298 (1977).

was unrepresentative or taken out of context. Defense counsel declined the district court's invitation, *see* Fed.R.Evid. 106, to designate a larger portion of the grand-jury testimony to be read by the prosecutor. We know of no independent duty of an examiner of a reluctant witness, *see supra* pp. 19–22, to introduce prior consistent testimony along with inconsistent testimony. Moreover, defense counsel were free to question Webbe about the meaning of his answers before the grand jury and, in the process, to introduce prior consistent testimony, *see* Fed.R.Evid. 801(d)(1)(B).

Noting that Webbe's initial grand-jury testimony was consistent with his trial testimony, and asserting that the district court's ruling was incompatible with the rationale of Rule 801(d)(1)(A) the defendants quote the following remark from the Notes of the Advisory Committee:

"In many cases, the inconsistent statement is more likely to be true than the testimony of the witness at the trial because it is made nearer in time to the matter to which it relates and is less likely to be influenced by the controversy that gave rise to the litigation." (quoting California Evidence Code § 1235).

However, the defendants fail to quote a comment, in the same paragraph, that the Rule " 'will provide a party with desirable protection against the "turncoat" witness who changes his story on the stand and deprives the party calling him of evidence essential to his case.' " In light of the fact that Webbe spoke with defense counsel seven or eight times after testifying before the grand jury but never with the government, which would not agree to Webbe's conditions for a meeting, we have little doubt that the latter rationale fully applied in this case.

Finally, we find no fault with the manner of the district court's ruling. After Dorfman's counsel stood to express his opinion that Webbe's grand-jury testimony concerned the contents of the May 21 recording, the court responded: "I do not agree

with that, sir, with all due respect to you. It is with regard to what occurred on January 10th." This response was invited by trial counsel who did not, either at the time or after the jury was excused, state an objection to the court's comment. We will not now isolate one comment from the lengthy trial to find a prejudicial error where none was recognized below.[8]

**B.**

▪ The May 21 recording, which prompted Webbe's grand-jury testimony, was itself admitted in evidence against the defendants as statements of co-conspirators, *see* Fed.R.Evid. 801(d)(2)(E). In this recording, Dorfman and Webbe are overheard informing Don Peters about an unfulfilled "commitment" to sell Senator Cannon a piece of Pension Fund property for $1,400,000. Dorfman expresses his frustration with Roy Williams, who also made the commitment, and the Pension Fund trustees who would not adequately pressure Palmieri. *See also supra* pp. 20–21.

After reviewing this recording, the district court found that "Mr. Dorfman is trying to get Peters to intervene to get something done." If this finding is justified, Dorfman's and Webbe's expressions were admissible as statements "in furtherance of the conspiracy," Fed.R.Evid. 801(d)(2)(E); *see United States v. Bentley*, 706 F.2d 1498, 1506 (8th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 107, 78 L.Ed.2d 110 (1983), and were not simply idle chatter, *see, e.g., United States v. Moore*, 522 F.2d 1068, 1077 (9th Cir.1975), *cert. denied*, 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976). The defendants ask us to examine the district court's finding and we will, but our review is governed by the clearly-erroneous standard. *See United States v. Aguirre*, 716 F.2d 293, 298 (5th Cir.1983); *United States v. Arruda*, 715 F.2d 671, 684 (1st Cir.1983); *United States v. Romano*, 684 F.2d 1057, 1066 (2d Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 509 (1982).

---

**8.** We also find no error in the district court's admission under Rule 801(d)(1)(A) of Webbe's grand-jury testimony concerning the length of the January 10 meeting.

We cannot term clearly erroneous the finding that Dorfman impliedly sought Don Peters' assistance. From what we know about Peters, described as a former Pension Fund trustee and one of the most important Teamsters in the Chicago area, he could have succeeded where Williams and the trustees had failed. Moreover, the May 21 conversation reveals that Peters was not ignorant of Senator Cannon's role in deregulation or Dorfman's associations with the Senator. Near the beginning of the recording, Peters, referring to Senator Cannon, states, "He took care of deregulation, didn't he?" Later in the conversation Peters and Dorfman talk about asking the Senator for "another favor." And, when Dorfman and Webbe cannot recall when the commitment to Senator Cannon was made, Peters reminds them that it was in "January, because _____ and I were there." In addition, the context of the May 21 discussion supports the district court's finding. Immediately after talking with Senator Cannon on the telephone and telling him that the Wonderworld deal was still alive, Dorfman began informing Peters of the "commitment." Subsequently, in the midst of bringing Peters up to date, Dorfman called Bjornsen, the Senator's son-in-law, and discussed a renewed offer to be made to Palmieri. Indeed, Dorfman's implied request for assistance did produce a suggestion from Peters that a group of Las Vegas Teamsters buy Wonderworld from the Pension Fund. This suggestion evoked laughter from Dorfman but not, as far as we can perceive from listening to the tape, because it was a joke. Rather Dorfman considered the idea too creative or complex for the Teamsters: "Don, the only problem Don is that that's what you and I could do."

Our conclusion that the May 21 conversation was admissible as co-conspirators' statements, coupled with no further Rule 801(d)(2)(E) challenge, disposes of the defendants' claim under the confrontation clause of the Sixth Amendment. *See United States v. Xheka,* 704 F.2d 974, 987 n. 7 (7th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *United States v. Kendall,* 665 F.2d 126, 133 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982); *United States v. Papia,* 560 F.2d 827, 836 n. 3 (7th Cir.1977); *United States v. Isaacs,* 493 F.2d 1124, 1161 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974). It should be plain to litigants that absent very persuasive reasons to overrule these cases, or a command from a higher authority, challenges to co-conspirators' statements should be based on the requirements of Rule 801(d)(2)(E), not on the Sixth Amendment.

### C.

The final evidentiary question concerns only Roy Williams. The district court ruled that the results of Williams' two ex parte polygraph tests were inadmissible and, in the process, denied Williams leave to present foundation evidence about the examinations. The district court's decision was based on two grounds. First, the court stated that "assuming, arguendo, validity to the theory of automatic response to stress occasioned by deception, the authorities in the area recognize as most unreliable ex parte, secret polygraph examinations, the likes of which Mr. Williams underwent here." Second, the court, noting that the test results could be admitted only to bolster Williams' credibility, declared, "[I]t is my judgment that it is far better that that credibility be resolved by the jury than by a polygraph examiner."

Before addressing Williams' contention that the district court erred, and responding to his plea for fundamental fairness, we question whether the admission of the polygraph results would have positively influenced the jury's view of Williams' credibility. At trial Williams testified that as the meeting in Senator Cannon's office on January 10, 1979, was ending, the Senator said, "Thanks Allen. I believe that I will make a bid on that property." According to Williams, Dorfman then remarked, "We'll do everything that we can to see that you get a fair shot at purchasing the property." Williams further testified that

he shortly thereafter learned that the property discussed in the Senator's office was the Wonderworld land. At his initial polygraph examination, however, Williams was asked: "At that meeting on January 10, 1979, did anyone in your presence discuss the Wonderworld property?" He answered, "No." This answer plainly does not square with Williams' trial testimony and thus, we surmise, he should be pleased that the test results were excluded. Nevertheless, we must consider Williams' legal challenge to the district court's ruling.

It is clear that the decision to exclude polygraph evidence is "within the sound discretion of the trial judge." *United States v. Rumell*, 642 F.2d 213, 215 (7th Cir.1981). What we mean by the term "discretion" is less clear. To say that a decision is committed to the district court's discretion could mean that the trial judge's ruling is unreviewable on appeal. *See* R. Dworkin, *Taking Rights Seriously* 31–32 (1977). We have not, *see, e.g., United States v. Feldman*, 711 F.2d 758, 767 (7th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983), and will not go that far in the context of a ruling on polygraph evidence. We will observe, however, that not all discretionary matters are of the same ilk. Certain judgments, such as the length of a criminal sentence, *see United States v. Torres*, 733 F.2d 449, 462 (7th Cir.1984), command more deference than other discretionary decisions, *see, e.g., Coyne-Delany Co. v. Capital Development Board of Illinois*, 717 F.2d 385, 392 (7th Cir.1983) (damages on an injunction bond).

A district court's decision concerning polygraph results deserves considerable deference. *See United States v. Black*, 684 F.2d 481, 483 (7th Cir.), *cert. denied,* 459 U.S. 1043, 103 S.Ct. 463, 74 L.Ed.2d 613 (1982). Indeed, Williams cites no case from this circuit, or any other circuit, that reverses a district court's decision refusing to

admit such evidence. Because this evidentiary question turns on a complex and imprecise balancing of factors, *see United States v. Bursten*, 560 F.2d 779, 785 (7th Cir.1977) (factors include accuracy, relevance, and prejudice), an appellant's burden is heavy to convince us that a reversible error occurred.

Viewed in this light, we hold that the district court did not abuse its discretion in excluding the results of Williams' two ex parte polygraph examinations. The district court's distrust of ex parte tests was rational; we expressed the same view in *United States v. Feldman*, 711 F.2d 758, 767 (7th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983). There is, however, a study that suggests our distrust is unfounded, *see* Raskin, Bardland & Podlesny, *Validity And Reliability of Detection of Deception*, National Institute of Law Enforcement and Criminal Justice (June 1978). But because Williams did not present this study to the district court, he is in no position to find fault with that court's reasoning. Moreover, the district judge's preference for the jury to decide credibility questions was entirely appropriate and in accord with our prior decisions.[9] *See United States v. Rumell*, 642 F.2d 213, 215 (7th Cir.1981).

IV.

Early one morning near the end of the trial, five jurors received telephone calls at their homes. The caller identified himself as a "representative" of "concerned citizens" and referred to the trial. Each juror promptly hung up the telephone but, in four instances the caller mentioned Allen Dorfman's name, in one case the caller urged Dorfman's conviction, and in one other call the unidentified "representative" mentioned the word "hoodlums." In light of these contacts, the defendants contend that the district court was required to

---

**9.** An argument also unique to Williams is that the district court should have granted his motion for a severance on the ground that prejudicial evidence "spilled over." To the extent that evidence was not admitted against Williams, the jury was so instructed. We find no abuse of discretion. *See United States v. Moschiano*, 695 F.2d 236, 245 (7th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 110, 78 L.Ed.2d 111 (1983).

grant a mistrial or, at least, to excuse the five contacted jurors.

 Not every improper ex parte contact with jurors requires a mistrial. *See United States v. Fleming,* 594 F.2d 598, 608 (7th Cir.), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979); *see also United States v. Norton,* 700 F.2d 1072, 1076 (6th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 1885, 76 L.Ed.2d 814 (1983). Our system of justice has not delegated to every reprobate the power to effect a mistrial. A trial may proceed if the court, after considering factors such as the communication's nature, the jurors' responses, and the curative ability of instructions, *see Sher v. Stoughton,* 666 F.2d 791, 795 (2d Cir.1981), finds that the jury can (and will) remain impartial and render a verdict based solely on the evidence, not the improper contact. This finding is essentially one of fact, *see Rushen v. Spain,* —— U.S. ——, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983), and is reviewable under the clearly-erroneous standard.[10] *See Owen v. Duckworth,* 727 F.2d 643, 646 (7th Cir.1984).

 Pursuant to an agreement between the parties, the district court questioned the five contacted jurors in chambers. The court asked each juror to describe the call, whether the call would affect his or her ability to be an impartial juror, and whether he or she could disregard the call and confine deliberations to the evidence, the lawyers' arguments, and the instructions. Transcripts of the questioning were provided to defense counsel who, subsequently, moved for a mistrial. In denying that motion, the district court stated:

> I observed the demeanor of all five of these people. I looked them in the eye as I questioned them. I had the advantage, or perhaps disadvantage, of having talked to them twice today on the subject, so I was interviewing them from some notes. I am confident that they

were being truthful, candid and honorable with us when they say they can put these experiences out of their mind and decide the case solely on the basis of the evidence that they hear in the courtroom, the arguments of the lawyers and the instructions, and that they will not discuss the experience with their fellow jurors. I am totally confident of that.

There was ample basis for the district court's belief. The district judge observed and worked with the jury, which he labeled "truly extraordinary," for many weeks. He observed the jurors as they described the calls and their reactions. We may not, as the defendants request, disregard jurors' statements as inevitably suspect. *See Smith v. Phillips,* 455 U.S. 209, 217 n. 7, 102 S.Ct. 940, 946 n. 7, 71 L.Ed.2d 78 (1982); *United States v. Fleming,* 594 F.2d 598, 608 (7th Cir.), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979). Moreover, we will not hold that the communications involved inherently or necessarily prejudicial remarks. Threats were not made and at most one juror heard a comment urging a guilty verdict, something properly heard from the prosecutor at trial. If more need be mentioned, we only note that throughout the lengthy trial the jurors diligently followed instructions, justifying the district court's observation, "I just think that they are going to abide my instructions."

The defendants focus special attention on juror Heller, who stated that she was unnerved by the call. What we wrote in the preceding paragraph, however, applies with equal force to juror Heller. Furthermore, the district judge remarked, "She was very composed when she was with me," and "I think what she is telling us is that she is distressed by the fact that someone would call her like that and would jeopardize her position in this case." The district court thus did not err in retaining Ms. Heller on the jury.[11]

---

10. Given the secrecy of jury deliberations, a prediction of impartiality is virtually the same as a post-verdict finding to the same effect. If, however, the court finds adequate reasons to doubt its prediction, the options of a new trial or post-conviction relief are available.

11. The district court did, on motion of the defendants, excuse one contacted juror.

In addition to assessing the impact of an improper contact, the district court has "broad discretion to remedy prejudicial influences." *United States v. Verkuilen,* 690 F.2d 648, 658 (7th Cir.1982). These discretionary tasks include, among other things, issuing instructions and granting severances. In this case the defendants contend that the district court abused its discretion when the court, after granting the government's motion to sequester the jury, told the jury of its reasoning.

Having reviewed ·the district court's statements, we cannot agree with the defendants. The district judge informed the jury that five jurors had received telephone calls of a similar nature. The judge further told the jury that he was convinced that no one connected with this case had anything to do with the calls. Finally, he told the jury that the caller did not pose a threat, but was simply a "crank." We believe that the district court's forthrightness prevented doubts and rumors that can be more prejudicial than truth. And by being frank and informing the jurors that the caller was not associated with the parties, the district court acted to avoid a very alarming possibility—a juror secretly learning of the calls and forming mistaken impressions, *see Owen v. Duckworth,* 727 F.2d 643, 648 (7th Cir.1984).

### V.

From the district court's jury instructions, the defendants select one to challenge:

> [A] scheme to deprive the Central States Pension Fund and its agent Victor Palmieri Company of information material to a decision which Victor Palmieri Company was required to make as a fiduciary and exclusive management agent of the Pension Fund also comes within the meaning of a "scheme or artifice to defraud."

Lombardo's counsel objected to this instruction on the ground that "[s]ix of them [jurors] may think that ... Palmieri was to be deprived of one set of information, and six may think that it was another set of information." To understand the import of this objection, which is renewed in the form of an argument on appeal, we must relate some aspects of the instruction conference.

When Lombardo's counsel stated his objection, the prosecutor responded that the instruction was taken directly from *United States v. Bush,* 522 F.2d 641 (7th Cir.1975), *cert. denied,* 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976). Indeed in *Bush* we explicitly approved the instruction challenged in the instant case. *See* 522 F.2d at 651 n. 10. On the basis of this precedent, the district court overruled the objection, but accepted an additional instruction from Lombardo that particularized the *Bush* instruction. *See infra* pp. 34–35. It is plain that Lombardo's objection found the wrong target. Counsel had no basis to challenge the district court's correct statement of wire-fraud law, *see United States v. Barta,* 635 F.2d 999, 1006 (2d Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981); rather counsel was asserting that the court's instructions were insufficient to ensure a unanimous verdict. But our review of the record and the briefs discloses no objection to the court's instruction on unanimity [12] and no alternative instruction tendered by the defendants. We would thus be justified in holding that the argument being made on appeal—that the instructions were insufficient to ensure a unanimous verdict—was waived. *See* Fed. R.Crim.P. 30. In the interest of justice we will not go that far but, to the extent that the court's instructions involved discretion, our review will be tempered by the lack of a properly directed objection.

A common tool to guarantee a unanimous verdict is the indictment. An indictment charging only one offense in a single count guards against a conviction on a less than unanimous verdict. *See United States v. Berardi,* 675 F.2d 894, 899 (7th Cir.1982). In the context of a proper indict-

---

**12.** The district court instructed the jury: "Take the forms to the jury room and when you have reached unanimous agreement on your several verdicts, you fill in and sign the verdict form.... Your verdicts, whether they be guilty or not guilty, must be unanimous."

ment, " '[i]t is assumed that a general instruction on the requirement of unanimity suffices to instruct the jury that they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict.' " *United States v. Murray*, 618 F.2d 892, 898 (2d Cir.1980) (quoting *United States v. Natelli*, 527 F.2d 311, 325 (2d Cir.1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976)); *see also United States v. Ferris*, 719 F.2d 1405, 1407 (9th Cir.1983). In the instant case, the indictment (Counts III to XI) did charge only one offense per count—one scheme to defraud the Pension Fund of the loyal services of O'Malley. *See United States v. Dorfman*, 532 F.Supp. at 1128. From the point of view of the charges, therefore, we cannot conclude that the court's general instruction on unanimity was deficient.

The defendants do not cite, yet appear to rely on the logic of *United States v. Gipson*, 553 F.2d 453 (5th Cir.1977), which held that the unanimous-verdict requirement connotes some agreement as to what the defendant did, not just that the defendant is guilty of a crime. *Gipson* did not require unanimous agreement about all details, only that the defendant did some act within a certain "conceptual grouping." *See id.* at 458–59. Since *Gipson*, courts have not precisely defined the phrase "conceptual grouping," but seem eager to hold that different acts are within the same grouping. *See, e.g., Lampkins v. Gagnon*, 710 F.2d 374, 377 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984); *United States v. Sutherland*, 656 F.2d 1181, 1202 (5th Cir.1981), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982).

Assuming, arguendo, that *Gipson* has some validity in this circuit, several factors lead us to conclude that in the present case the jury agreed on facts within the same genus. At defense counsel's suggestion, the district court followed the challenged instruction with: "It is for you to decide

whether the government has proved beyond a reasonable doubt that Mr. O'Malley failed to disclose any facts to the Pension Fund and Victor Palmieri Company and, if so, whether the facts were material." This focused the jury's attention on O'Malley, and the indictment alleged only one material nondisclosure—the failure to tell Palmieri of O'Malley's activities in "causing the withdrawal of bids on the Wonderworld property."

In the final analysis, "only common sense and intuition can define the specificity with which the jury must describe the defendant's conduct before it convicts." Note, *Right to Jury Unanimity on Material Fact Issues*, 91 Harv.L.Rev. 499, 502 (1977). That common sense and intuition, in turn, is informed by the circumstances of the case and the arguments of the parties. In the absence of an appropriate unanimity instruction tendered by the defendants, we will not reverse the convictions on the ground of faulty instruction.[13] *See United States v. Pavloski*, 574 F.2d 933, 936 (7th Cir.1978).

## VI.

Joseph Lombardo maintains that his convictions must be reversed for insufficient evidence. Extracting from Lombardo's brief the core of his argument, we find the assertion that the government did not sufficiently prove (1) his knowledge of the conspiracy, and (2) his intent that O'Malley would fail to disclose material facts to the Pension Fund and Palmieri.

A person is not a co-conspirator, of course, if he is unaware of the "essential nature" of the conspiracy. *United States v. Fellabaum*, 408 F.2d 220, 224 (7th Cir.1969); *see United States v. Annoreno*, 460 F.2d 1303, 1309 (7th Cir.), *cert. denied*, 409 U.S. 852, 93 S.Ct. 64, 34 L.Ed.2d 95 (1972). The requisite knowledge may be established by circumstantial evidence or inferred from basic facts. *See United States v. Zuideveld*, 316 F.2d 873,

---

**13.** We also reject the argument that the district court erred in instructing the jury that O'Malley "had a duty to disclose and not to conceal" facts material to the decisions of the Pension Fund and its agent, Palmieri.

878 (7th Cir.1963). Indeed, the quantum of proof that the government must produce is not great; "[p]resence has been sufficient evidence of knowing participation in a conspiracy when there were suspicious circumstances, and the existence of the conspiracy was already established." *United States v. Dalzotto*, 603 F.2d 642, 645 (7th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979); *see United States v. Holmes*, 452 F.2d 249, 255–56 (7th Cir. 1971), *cert. denied*, 405 U.S. 1016, 92 S.Ct. 1291, 31 L.Ed.2d 479 (1972).

■■■ We find ample evidence to support the jury's conclusion that Lombardo was not an unwitting dupe, but a knowledgeable co-conspirator. A recording of a telephone conversation on January 30, 1979, plainly establishes that Lombardo selected two men associated with the Pension Fund, O'Malley and Massa, to travel to California to convince Glick to withdraw his Wonderworld bid. The trip succeeded and Lombardo was so informed on February 2, 1979. In a telephone conversation on that date William Webbe told Lombardo that Glick was willing to withdraw and, in fact, only bid on the property after Palmieri "brought it to him." Lombardo expressed satisfaction and directed Webbe to "stay right on top of it."

Lombardo's knowledge of the purpose of O'Malley and Massa's trip—to assure that Senator Cannon's group was the sole bidder on Wonderworld—may be inferred from several facts. In the conversation of February 2, Webbe told Lombardo: "I will let you ... know out there the minute everything is completed." If Lombardo is interested in the outcome of his efforts, a reasonable jury could infer that Lombardo knows the objective of his work. Furthermore, it is unlikely that Webbe and Dorfman would have solicited and relied on the advice of Lombardo, who termed himself "an old time general," without informing Lombardo of the conspiracy's objective. In

addition, Lombardo and Dorfman were overheard on May 17, 1979, discussing how the Pension Fund's asset managers were independent from the Teamster leaders. Lombardo stated, "You got a, you got an example with Palmieri. With the Cannon deal." Finally, having listened to the pertinent recordings and heard the alacrity of Lombardo's comments, we do not hesitate to hold that the jury justifiably found Lombardo fully informed.

■■■ That the word "deregulation" was not used in Lombardo's conversations is of no moment. A co-conspirator need not know the details, *see United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir.1980) (en banc), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981), or every objective of the conspiracy, *see United States v. Frans*, 697 F.2d 188, 190 n. 1 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 104, 78 L.Ed.2d 107 (1983). Knowledge of the conspiracy's essential nature, *see United States v. Fellabaum*, 408 F.2d 220, 224 (7th Cir.1969), or the "kind of criminal conduct ... in fact contemplated," *United States v. Gallishaw*, 428 F.2d 760, 763 n. 1 (2d Cir.1970), is sufficient. As noted above, the government adequately proved knowledge of a plan to offer a "thing of value" to Senator Cannon and, from the secretive nature of the operation (Lombardo told Webbe over the phone, "Just don't mention names"), the jury could infer that Lombardo knew the favor was intended "to influence an[ ] official act." 18 U.S.C. § 201(b)(1).[14]

From our analysis of the conspiracy evidence, it follows that the jury could properly infer Lombardo's intent that O'Malley not disclose material facts to Palmieri. The plan to bribe the Senator demanded secrecy. Had O'Malley told Palmieri of his efforts to secure the withdrawal of Glick's $1,600,000 bid, the conspiracy and fraudu-

---

**14.** There was sufficient evidence, in any event, to support the jury finding that Lombardo was

aware of the intent of the co-conspirators to

lent scheme would have collapsed even sooner than it eventually did.[15]

## VII.

▆ After sentencing, the defendants filed motions for a new trial based on newly discovered evidence, *see* Fed.R.Crim.P. 33. The defendants' "newly discovered evidence" consisted of former F.B.I. agent H. Edward Tickel's affidavit, which states that prior to obtaining any Title III authorization, he participated in two surreptitious entries into the offices of Allen Dorfman's Amalgamated Insurance Agency. The defendants contend that Tickel's allegations, if true, warrant suppression of the evidence obtained through electronic surveillance. The district court, without holding an evidentiary hearing, denied the new-trial motions. We could affirm on any of several grounds, but will select the most obvious one—the defendants' lack of standing.

Standing analysis is, in essence, a bipartite inquiry: who is a proper party to urge suppression of a piece of evidence, and whose rights may a proper party assert? Because the defendants' conversations were overheard and recorded, they are proper parties to maintain that the tapes should be suppressed. *See* 18 U.S.C. §§ 2510(11), 2518(10)(a). The defendants reach an insurmountable obstacle, however, when the nature of their suppression argument is considered and the person whose rights were allegedly violated is identified.

Tickel, according to his affidavit, did not enter any of the defendants' offices; he was only in Amalgamated Insurance Agency's exterior lobbies and corridors, the alarm room, and the frame room. *United States v. Williams*, 565 F.Supp. 353, 361 (1983). The district court found, and the defendants do not challenge, that no defendant "used the areas searched in any way that created a legitimate expectation of privacy." *Id.* at 362; *see also United States v. Alewelt*, 532 F.2d 1165, 1168 (7th Cir.), *cert. denied*, 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976). Tickel's alleged searches did violate Allen Dorfman's rights but these searches, which the defendants contend mandate suppression of the electronic evidence, "did not infringe *their* fourth amendment rights." 565 F.Supp. at 362 (emphasis added).

▆ Under both Fourth Amendment principles, *see United States v. Payner*, 447 U.S. 727, 731 (1980), and Title III law, *see United States v. Fury*, 554 F.2d 522, 525 (2d Cir.1977), *cert. denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978), a defendant may not obtain the exclusion of evidence on the ground that someone else's rights were violated. In other words, a defendant may assert only his own rights. Consequently, a defendant may not successfully challenge the admissibility of evidence on the basis that the evidence is tainted (or "the fruit of") some past infringement of another's rights. *See United States v. Williams*, 580 F.2d 578, 583 n. 21 (D.C.Cir.) (Title III case), *cert. denied*, 439 U.S. 832, 99 S.Ct. 112, 58 L.Ed.2d 127 (1978); *United States v. Wright*, 524 F.2d 1100, 1102 (2d Cir.1975) (same); *see also United States v. Chase*, 692 F.2d 69, 70 (9th Cir.1982) (Fourth Amendment standing law); *United States v. Hansen*, 652 F.2d 1374, 1386–87 (10th Cir.1981) (same). In this case, the defendants would not have a constitutional cause of action against Tickel for his two searches of Amalgamated Insurance Agency, and we will not, for purposes of the exclusionary rule, permit an indirect attack where no direct challenge is possible.

Furthermore, *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), precludes the invocation of our supervisory powers. In *Payner* the Court held that a federal court may not "use its supervisory power to suppress evidence tainted by gross illegalities that did not

influence Senator Cannon's actions on deregulation.

**15.** Lombardo also makes the "constitutional" argument that the trial was too complex for the jury to understand and counsel to render effective assistance. To accept this argument, we would have to rewrite several chapters of any constitutional-law treatise. This we decline to do.

infringe the defendant's constitutional rights." *Id.* at 733, 100 S.Ct. at 2445. We will not permit an end run around *Payner* by holding, as the defendants request, that the government's failure to inform the Title III authorizing court of Tickel's searches was a material omission, *see generally supra* p. 604, requiring suppression.

Finally, we disagree with the defendants that, assuming Tickel's allegations are true, the district court was required to reverse its earlier finding of no *Franks* violation, *see supra* pp. 602–604. The Tickel affidavit is simply not that probative of whether the government made intentional or reckless misrepresentations in the March 1, 1979, Title III application. Indeed, an overzealous government agent might be less likely to doubt the truth of criminal allegations than a detached investigator. In any event, we will not rule that the district court abused its discretion, *see United States v. Oliver,* 683 F.2d 224, 228 (7th Cir.1982), in refusing to reverse its earlier *Franks* ruling.

### VIII.

For the reasons expressed in this opinion, the judgments of conviction and the order denying the new trial are affirmed.