**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Michael T. DUGAN, II,**
**Defendant–Appellant.**

No. 89–2438.

United States Court of Appeals,
Seventh Circuit.

Argued April 13, 1990.

Decided May 15, 1990.

Rehearing Denied June 13, 1990.

Larry A. Mackey, Scott C. Newman, Asst. U.S. Attys., Indianapolis, Ind., for plaintiff-appellee.

Kevin McShane, Henry Y. Dein, Indianapolis, Ind., for defendant-appellant.

Before CUDAHY, POSNER and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Defendant Michael T. Dugan, II, appeals his convictions for mail fraud, wire fraud, extortion, bribery and engaging in a pattern of racketeering activity. He claims that the admission of co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E) deprived him of his confrontation rights under the sixth amendment and, in addition, that the evidence presented at trial was insufficient to support his convictions for mail fraud. We affirm.

## I.

In 1974, Dugan was elected to a four year term as Judge of Marion Superior Court, Civil Division, Room Number V, an Indiana court having general jurisdiction over all types of civil and family litigation. He was re-elected to a six-year term in 1978, and again in 1984. Dugan has admitted that during his tenure he engaged in three separate illegal remunerative schemes: extortion of receivership and appraisal appointees, extortion of a company placed in a trusteeship under his control, and the improper use of public money for personal use.

In 1974, Dugan's friend Robert I. Highfill was involved in some of the discussions that led to Dugan being slated as a judicial candidate. Within thirty days of his election to the superior court bench, Judge Dugan called Highfill to his chambers and explained to him that as a judge, he had the power to make remunerative court appointments. He thereafter appointed Highfill regularly to court-ordered appraisals and receiverships.

In 1977, as the frequency and profitability of Highfill's court appointments were increasing, Dugan asked Highfill to obtain a station wagon so that Dugan and his family could vacation in Las Vegas and California. At Dugan's direction, Highfill gave him a number of gasoline credit cards which he then used, signing the name "Robert Highfill" or "Michael Highfill" to purchase approximately $250 in gasoline for the wagon at Highfill's expense along his route from Indiana to California and back.

By 1979, Highfill had become wholly dependent upon court appointments from Dugan for his livelihood. In that year, shortly after authorizing a $2,500 payment to Highfill as receiver for a case in his court, Dugan asked Highfill to loan him $2,000. Highfill gave Dugan the money in cash and it was never repaid. In 1982, Dugan again asked Highfill to finance a personal vacation by obtaining a van for the judge's fishing trip to Canada. Highfill once more acquiesced to Dugan's demands.

John P. Flanagan was also a long-time friend and political ally of Dugan. From the late 1970's until September of 1980, Flanagan received only two court appointments from Dugan. In September of 1980, Flanagan had a lunch conversation with Dugan during which he agreed to pay Dugan, in cash, forty percent of every receivership or appraisal fee that Dugan authorized. After this meeting, and through March of 1985, Flanagan received fifty receiverships and appraisal appointments from Dugan. In every receivership or appraisal case to which Flanagan was appointed, Dugan personally authorized the payment of fees, arranged to meet with Flanagan, waited while Flanagan cashed the fee checks, and personally collected his cash kickback. Flanagan eventually plead-

ed guilty to paying Dugan a total of $31,-240 in cash in return for court appointments.

In addition to kickback agreements involving receivership and appraisal cases, Dugan extorted unlawful payments from most of the principal executives of a troubled insurance company which was the subject of a rehabilitation lawsuit pending for ten years in his court. Underwriters National Assurance Company ("Underwriters") was an Indianapolis-based stock-type insurance corporation. The company principally sold health and disability insurance policies to commercial airline pilots. By 1974, stock in the company was being publicly traded, with hundreds of shareholders across the United States and tens of thousands of policyholders worldwide. Underwriters owned approximately twenty-five million dollars in assets, consisting primarily of commercial real estate and a stock and bond portfolio.

In 1974, the Indiana Department of Insurance (the "Department"), which regulated all insurance companies doing business in the state, found Underwriters to have insufficient reserves with which to meet certain obligations to its policy holders. Specifically, Underwriters was obligated on a substantial block of its business to make premium refunds to policyholders who had avoided filing any claims during a ten-year period. The Department determined that Underwriters could not meet its premium refund obligations while maintaining the reserves necessary to protect current policyholders. It therefore filed a "rehabilitation" lawsuit under an Indiana statutory provision authorizing court supervision for financially troubled insurance companies.

In 1976, Judge Dugan approved a Plan of Rehabilitation for Underwriters. The Plan permitted the company to return to normal operation while acknowledging a $2.5 million dollar debt to the policyholders entitled to premium refunds. The Plan allowed ten years—until November 22, 1986—for the company to repay the $2.5 million to the policyholders out of surplus generated from its business operations. As for the stockholders of Underwriters, the Plan re-

quired them temporarily to place their stock in a trust to be supervised by the court. Each year the court would appoint a board of trustees to hold and vote the stock until the policyholders had been repaid, at which time the stockholders would take back legal title to their stock. If, by November 22, 1986, the policyholders still had not been repaid, the Plan provided that the stockholders would forfeit all their stock. Those policyholders still remaining with Underwriters in 1986 would become entitled to a default remedy: Underwriters would be converted to a mutual company, of which the remaining policyholders would be the nominal owners. This procedure came to be known as "mutualization."

The Plan contemplated a limited supervisory role for the court during its ten-year duration, consisting primarily of appointing the board of trustees and ensuring that policyholders were properly repaid from the company's profits in accordance with the Plan. As time went by, however, Dugan became constantly more active in the business affairs of Underwriters. Although not provided for in the Plan, Dugan selected or approved the chairmen of the boards of trustees and directors, the company's successive presidents, the company's management contracting arrangements, marketing managers, and legal counsel. He also fixed the compensation levels for these individuals, drafted their employment or agency contracts, conducted job interviews of prospective employees, fired executives when they displeased him, and negotiated their severance agreements.

Dugan used this assumed power to extort $190,000 from the company over a nine year period by demanding kickbacks from his appointees and inflating the salaries of his appointees to cover the kickbacks. The details of the scheme are unimportant for our purposes, although we relate a few instances as examples. Much of the scheme was run through Robert Eichholtz, a close friend of Dugan's who at the time was chairman of the boards of directors and of the trustees of Underwriters. In early 1979, Eichholtz approached David Phipps, an executive at Underwriters, and said that he had been making periodic pay-

ments of cash to Dugan. Eichholtz told Phipps that if Phipps wished to remain employed at Underwriters, he should also begin making payments, in the amount of $200 each month. By 1983, Phipps' salary was raised from $40,000 to $99,000 and his required monthly kickback payment was increased to $700.

Dugan also extorted payments from Dr. James R. Riggs. Dugan appointed Riggs as trustee and approved an increase in trustee fees from $2,500 to $6,000. Riggs was told by Eichholtz that Dugan would expect $1,000 per year payment in cash if Riggs wished to keep his position. Riggs agreed to this arrangement. When Eichholtz died in 1983, Riggs replaced him as chairman of the board of directors. As chairman, Riggs was to receive $1,000 each month, $300 of which was paid back to Dugan. In 1983, Riggs' salary was increased to $3,000 per month of which Dugan received $1,000. All in all, Riggs ended up paying Dugan $39,000 in cash kickbacks from fees and salary.

Without belaboring the point, Dugan also extorted money from several other people by exercising his control over the company. These people included Eichholtz and Flanagan (in addition to the amounts he extorted from Flanagan from the receiverships and appraisals), among others. In each case, the extortion scheme was the same: Dugan would require kickbacks for appointments with the company, inflating salaries to cover the costs of the kickbacks.

In addition to these direct cash payments, Dugan enjoyed an Underwriters expense account, which allowed him to dine several times each week, to vacation frequently at resorts in California, and to tour Europe, all at Underwriters expense. The actual dollar amounts from these more indirect financial benefits totalled more than $21,000.

Finally, with respect to Underwriters, Dugan attempted to purposefully cause mutualization and name himself as the future chairman of the board of the mutualized company. This action would have deprived the policyholders of about $2,500,-000, plus interest, and would have resulted in the stockholders receiving nothing for their stock. Several co-participants in the scheme to acquire Underwriters testified that the long-range plan for Underwriters was to have culminated in "taking the company private," to be personally owned by Dugan and his confederates once the company had been relocated to California. Accordingly, Dugan hired, at company expense, California corporate counsel to research the means by which a California mutual insurance company could be "demutualized," i.e., taken private. Dugan was also instrumental in founding an incorporated California insurance agency, which was the planned vehicle for the later private acquisition of Underwriters. Fortunately, this plan was unsuccessful. Revelations of the business relationships between Dugan and Flanagan appeared in the local news media. Amid intensified regulatory scrutiny and public outcry, Dugan resigned from the Underwriters case and the case was reassigned to another judge.

Dugan's scheme to take over and relocate Underwriters to California required him to establish his own residence there as well. This aspect of his plan was facilitated by a separate scheme to defraud Marion County, Indiana. On four occasions, the defendant obtained county monies for personal travel to California by submitting to the county false statements to the effect that his purpose was to attend various judicial conferences. On three of these occasions, Dugan sat for the California bar examination. The fourth time, he shopped extensively for residential real estate. On each occasion, Dugan signed a certification stating that the charges to the county were "necessary to the public business." The total dollar loss to the county was $2,834.19.

In total, Dugan received $226,073 in unlawful and unreported cash payments from persons to whom he awarded lucrative court appointments, $21,284.69 in food, lodging, travel and entertainment from a party to a lawsuit pending in his court, and $2,834.19 in travel expenses fraudulently obtained from Marion County, Indiana. On

December 19, 1988, a grand jury returned a superceding 29–count indictment charging Dugan with conspiring to and conducting the affairs of his court through a pattern of racketeering activity consisting of mail fraud, wire fraud, extortion, and bribery in violation of 18 U.S.C. § 1962(c). Dugan was also charged with mail fraud, in violation of 18 U.S.C. § 1341, wire fraud, in violation of 18 U.S.C. § 1343, extortion, in violation of 18 U.S.C. § 1951, tax fraud, in violation of 26 U.S.C. § 7201, and conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. Flanagan, who was named in 23 counts of the indictment, entered into a plea agreement with the government whereby he would testify against Dugan.

Before trial, Dugan filed a motion to dismiss all sixteen mail fraud counts on the ground that those counts failed to allege a scheme to deprive others of money or property rights as required by *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). The district court denied the motion. The district court also ordered the government to file a written pretrial proffer to allow the court to make preliminary rulings on the admissibility of the hearsay statements of alleged co-conspirators under either Federal Rule of Evidence 801(d)(2)(E) or Rule 804(b)(3). Before trial, the district court ruled that the requirements for admissibility had been met under both Rule 801(d)(2)(E) and 804(b)(3).

After a two-and-a-half week trial, the jury returned a guilty verdict on 25 of the counts. Dugan was sentenced to eighteen years in prison, ordered to make restitution to Marion County, Indiana, in the amount of $2,556.19, and required to forfeit certain property interests derived from racketeering activity. Dugan appeals, arguing that the government did not proffer sufficient evidence of mail fraud in accordance with *McNally*, and that he was denied his sixth amendment confrontation clause rights by the admission of the co-conspirator hearsay evidence.

## II.

Dugan argues that he was denied his right to confront witnesses guaranteed by the sixth amendment because crucial statements of an unavailable co-conspirator were admitted. Specifically, he maintains that statements of Robert Eichholtz, who died prior to trial, were crucial to the case against him and lacked adequate indicia of reliability to satisfy the sixth amendment. Dugan identifies fourteen statements by Eichholtz which he claims were central to the prosecution's case, the admission of each he claims was unconstitutional.

Prior to trial, in response to a motion in limine, the district court made a preliminary determination that the co-conspirator statements were admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence. The district court also found that the statements were admissible under Rule 804(b)(3) because the statements were against penal interest. Dugan concedes the admissibility of the statements under these rules. Dugan additionally concedes that it is the rule of this Circuit, as stated in *United States v. Williams*, 737 F.2d 594 (7th Cir.1984), that an adequate determination of the admissibility of co-conspirator statements will dispose of sixth amendment confrontation claims as well. In *Williams* we stated "[i]t should be plain to litigants that absent very persuasive reasons to overrule these cases, or a command from a higher authority, challenges to co-conspirators' statements should be based on the requirements of Rule 801(d)(2)(E), not on the Sixth Amendment." 737 F.2d at 610. Nevertheless, it is Dugan's contention that we should create an exception to *Williams* because of the importance of these statements to the prosecution. He argues that when co-conspirator statements play a prominent role in the prosecution's case, the government should be required to submit additional indicia of reliability beyond that implicit in Rule 801(d)(2)(E).

Dugan offers *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) in support of his proposed rule. In *Dutton*, which was decided prior to enactment of the Federal Rules of Evidence, a plurality

of the Supreme Court held that the admission of a co-conspirator statement did not violate the confrontation clause because there were sufficient indicia of reliability. The Court listed, among other factors of reliability, that the "statement was spontaneous and it was against his penal interest to make it." 91 S.Ct. at 220. The Court went on to say that "[t]hese are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant." *Id.* Dugan reads this case as requiring evidence of reliability in addition to that required by 801(d)(2)(E) to satisfy the confrontation clause.

We disagree. *Williams* was decided long after *Dutton* and with the principles of *Dutton* well in mind. There is, in fact, some doubt about our power to create an exception to *Williams*. The Supreme Court stated in 1987 that "the Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)." *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 2783, 97 L.Ed.2d 144 (1987). The Court reasoned that "the hearsay rules and the Confrontation Clause are generally designed to protect similar values ..." *Id.* 107 S.Ct. at 2782 (citations omitted). Because the co-conspirator statements "have a long tradition of being outside the compass of the general hearsay exclusion," admission of these statements does not offend the confrontation clause. *Id.* at 2783.

Our precedents anticipated *Bourjaily*. See e.g. *United States v. Molt*, 772 F.2d 366, 369 (7th Cir.1985); *Williams*, 737 F.2d at 610; *United States v. Kendall*, 665 F.2d 126, 133 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982); *United States v. Papia*, 560 F.2d 827, 836 n. 3 (7th Cir.1977); *United States v. Isaacs*, 493 F.2d 1124, 1161 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974). We explained the underlying logic of *Williams* in *Molt:*

> The declarations of conspirators are usually reliable in the pertinent sense. They are contemporaneous statements in an ongoing business relation. The person who reports these statements may be unreliable, but he is in court and may be cross-examined. If the witness recounts the statements accurately, there is no particular reason to believe that the business arrangements among the conspirators are other than as the statements depict them.

772 F.2d at 369. This logic applies to the instant case. Eichholtz is not available for cross-examination, but those who are testifying that he made certain statements are available. Under the logic of *Molt*, if it is established that Eichholtz made the statements attributed to him, it is reasonable to conclude that they accurately portray the course of events because of his role in an ongoing conspiracy.

The rule in *Williams* represents a long and consistent line of decisions of this Circuit. We have never taken up the numerous offers to create exceptions to this rule and now the Supreme Court has indicated its general agreement with our approach. We agree with the assessment put forth in *United States v. Shoffner*, 826 F.2d 619 (7th Cir.1987):

> This court has held too many times to require extended discussion that where a statement is admissible under Rule 801(d)(2)(E), there can be no Confrontation Cause violation. *E.g. United States v. Balistrieri*, 779 F.2d 1191, 1223, (7th Cir.1985). The Supreme Court appears to have sanctioned this *per se* rule in two recent cases. [*Bourjaily*]; *United States v. Inadi*, [475 U.S. 387], 106 S.Ct. 1121 [89 L.Ed.2d 390] (1986) (Confrontation Clause does not require unavailability of the declarant as a prerequisite to the admission of coconspirator statements). Accordingly, we once again decline the invitation to overrule our many cases so holding.

826 F.2d at 630 n. 14.

█ Dugan's second contention on appeal is that the government did not offer sufficient evidence to sustain a conviction of mail fraud under the requirements of *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). In *McNally*, the Supreme Court held that the "mail fraud statute clearly protects proper-

ty rights, but does not refer to the intangible right of the citizenry to good government." *Id.*, 107 S.Ct. at 2879. The government must, therefore, prove that the defendant engaged in conduct which resulted in loss of some property right or expectation by a victim of the scheme. Dugan claims he was convicted merely for failing to provide good government.

Dugan faces a heavy burden on appeal. To overturn a jury verdict, he must prove that "the trial record contains no evidence, no matter how it is weighed, from which a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *United States v. Davis*, 890 F.2d 1373, 1377 (7th Cir.1989). It is difficult to believe that Dugan can argue that there is no evidence that a victim of his scheme lost property, expectation of a property right, or some other concrete economic interest. The evidence was overwhelming that Dugan stole over a quarter of a million dollars from a corporation and the public.

Nevertheless, he attempts to make this claim, dividing his argument into three contentions. First he claims that there was no loss to Underwriters' stockholders because they had given up their stock to a trustee and therefore they had no right to profits from the company. We disagree. The stockholders had an expectation of a return of their stock once the premiums were paid the policyholders. Extortion from the company diminished this expectation. In addition, the company itself was economically harmed by Dugan's action.

Second, Dugan argues that the policyholders did not lose a property interest because they would have benefited from a mutualization of the company. To the contrary, the policyholders were to be directly paid from the proceeds of the company. Diminishing the proceeds of the company reduced payments to policyholders. In addition, in the event of a mutualization, the policyholders' equity would be the portfolio of the company. Extorting from the company reduced the potential future equity of the policyholders.

Finally, Dugan argues that the taxpayers of Marion County did not lose a property right when he illegally used county monies for personal use. He claims that this argument "presumes, without evidentiary support, that Judge Dugan was the only judge in Marion County, or the State of Indiana for that matter, who traveled for quasi-judicial or even personal reasons." Dugan is wrong. The conviction is for *his* illegal use of government funds; the conduct of other officials is irrelevant. Moreover, the mail fraud counts for illegal use of county monies is not simply a claim to good government. The crime Dugan has been charged with is essentially "depriv[ing the public] of control over how its money was spent." *McNally*, 107 S.Ct. at 2882.

Although this case involved a defendant who committed his crimes by virtue of the public office he held, he was charged with devising and participating in fraud schemes which sought nothing more basic than money. He deprived his victims of over a quarter of a million dollars. This more than satisfied the requirement of *McNally* that the scheme "result in some kind of concrete economic harm." *United States v. Folak*, 865 F.2d 110, 113 (7th Cir.1988).

III.

For the foregoing reasons, the decision of the district court is AFFIRMED.