**Brett C. KIMBERLIN**

v.

**Stephen DEWALT, Warden FCI–Petersburg.**[1]

No. Civ.A. AW–97–3829.

United States District Court, D. Maryland.

June 30, 1998.

---

1. Pursuant to 28 U.S.C. Section 2243, the proper party respondent in a habeas corpus case is the

''person having custody of the person detained.'' On May 4, 1998 petitioner was transferred from FCI–Cumberland to FCI–Petersburg. Accordingly the Warden at FCI–Petersburg shall be substituted for the United States Parole Commission as the proper party respondent in this case.

Brett C. Kimberlin, pro se.

Lynn A. Battaglia, United States Attorney, Tamera L. Fine, Assistant United States Attorney, of Baltimore, MD, for Defendant.

## AMENDED MEMORANDUM

WILLIAMS, District Judge.

On June 27, 1997 the United States Parole Commission revoked Brett C. Kimberlin's parole.[2] On November 10, 1997 Kimberlin filed a petition for writ of habeas corpus challenging the revocation. After giving petitioner time to supplement his petition (see Paper Nos. 2 and 3), the Court on December 18, 1997 required the United States Parole Commission to respond to the petition. (See Paper No. 7). The Commission has filed its response. (See Paper No. 12). Petitioner

**2.** Petitioner, whose criminal history will be detailed herein, is presently serving an aggregate federal sentence of 51 years, 6 months and 19 days, imposed by the United States District Courts for the Southern District of Indiana and the Southern District of Texas. See Paper No. 12, Exhibit A. Although petitioner at the time of filing this case was incarcerated at the Federal Correctional Institution at Cumberland, Maryland, this Court later authorized Federal Bureau of Prisons personnel to transfer him to the Federal Correctional Institution at Petersburg, Virginia. See Paper No. 47.

**3.** Other circuits use this same standard of review, but call it a "rational basis" test for revocation. See Lewis v. Beeler, 949 F.2d 325 (10th Cir.), cert. denied, 504 U.S. 922, 112 S.Ct. 1972, 118 L.Ed.2d 572 (1992).

has filed objections to the response (see Paper No. 19), and the Commissioner has filed a reply to those objections. (See Paper No. 25). A hearing is not necessary for the resolution of this case. See Local Rule 105.6.

### Standard for Review

On judicial review, a parole violator may not retry the evidence against him. Garcia v. Neagle, 660 F.2d at 988; 18 U.S.C. Section 4218(d). Judicial review is satisfied as long as "some evidence" exists to support the agency's revocation.[3] For reasons set forth herein, petitioner has failed to meet this burden here.[4]

In order to prevail, petitioner must show that the Commission "exceeded its legal authority, acted unconstitutionally or failed to follow its own regulations" in revoking his parole. See Garcia v. Neagle, 660 F.2d 983, 988 (4th Cir.1981), cert. denied, 454 U.S. 1153, 102 S.Ct. 1023, 71 L.Ed.2d 309; see also Townsend v. Sain, 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) (habeas petitioner must show that detention is unlawful).

### Petitioner's Criminal History

On June 11, 1980 petitioner was sentenced to four years following his conviction in the United States District Court for the Southern District of Texas for conspiracy to possess with intent to distribute marijuana.[5]

On November 3, 1980 petitioner received a consecutive 12 year sentence following his conviction in the United States District Court for the Southern District of Indiana for possession and illegal use of Department of Defense insignia, illegal use of the Seal of the

**4.** While this Court has summarized key portions of the evidence relied upon by the Parole Commission in reaching its revocation decision, a more detailed summary can be found in the government's Response, Paper No. 12, at 36–41.

**5.** According to his 1981 presentence report, petitioner was arrested in 1979 after seizure of a Douglas DC–3 aircraft bearing Columbian registration. Approximately 10,000 pounds of marijuana were found on the ground along the aircraft's flight path. Drug Enforcement Agency agents concluded that petitioner was the organizer and funding source for the operation, which included the purchase of the aircraft. See Paper No. 12, Exhibit B.

President of the United States, and impersonation of a federal officer. *See* Paper No. 12, Exhibit C.

On June 4, 1981 petitioner received a consecutive five year sentence following his conviction in the United States District Court for the Southern District of Indiana for receipt of explosives by a convicted felon.[6]

On December 30, 1981 petitioner received a 50-year concurrent sentence from the United States District Court for the Southern District of Indiana for possession of an unregistered destructive device, unlawful manufacturing of a destructive device, malicious damage by means of explosives, and malicious damage by means of explosives involving personal injury. As set forth in his presentence report, during a six day period in September, 1978 eight bombs made of Tovex 200 dynamite were detonated in the Speedway, Indiana area.[7] One bomb, placed in a gym bag in the Speedway High School parking lot, detonated on September 6, 1978, when it was picked up by Carl and Sandra DeLong after a high school football game. Sandra DeLong received permanent nerve damage caused by bomb fragments in her leg. Her husband Carl lost his right leg and two fingers.[8] Carl DeLong received additional injuries to his inner ear, stomach, chest, neck and arm due to bomb fragments, and endured a series of operations. *Id.,* Exhibit B at 4. On February 23, 1983 Carl DeLong committed suicide at the age of 44.

### Petitioner's History of Civil Litigation Arising Out of His Criminal Conduct

On October 23, 1983 a Marion County, Indiana jury awarded $360,000 to Sandra

DeLong for her injuries, and $1,250,000 for the wrongful death of Carl DeLong. The Indiana Court of Appeals reversed the wrongful death judgment, holding that Carl DeLong's suicide was, as a matter of law, an intervening cause.[9] The Supreme Court of Indiana reinstated the wrongful death judgment on June 13, 1994, finding that Carl DeLong's death "was within the scope of harm intended by Kimberlin's intentional criminal conduct." [10]

Sandra DeLong attempted to collect on her judgment by obtaining a writ of attachment against petitioner's prison commissary account after a United States Probation Officer informed her that petitioner regularly transferred money to someone outside the prison. Petitioner promptly sued Mrs. DeLong, her lawyer, the probation officer, and various Bureau of Prisons and Department of Justice officials for money damages. Petitioner's action was not successful. *See Kimberlin v. U.S. Department of Justice,* 788 F.2d 434 (7th Cir.1986).

In 1992 Sandra DeLong obtained a ruling from the United States Court of Appeals for the Seventh Circuit upholding the disbursement of money previously seized from petitioner by the FBI toward payment of her judgment.[11]

### Petitioner's Activities During Parole

On February 13, 1994 petitioner was released on supervised parole in this district.[12] Petitioner inherited $155,147 from his father's estate. Additionally he developed business deals (including an oil project, a

---

6. Petitioner possessed two 50-pound boxes of Tovex 200 dynamite while on probation from a 1973 felony conviction for perjury. Part of the dynamite was used to blast holes in the earth to construct an underground storage vault, while some of the dynamite was used in petitioner's next offense. *See id.,* Exhibit B at 9.

7. The bombs were made with electronic blasting caps attached to a six-volt battery detonated by a timer. Some contained lead shot. All but one were placed near homes, buildings, schools and other places open to the public.

8. The fingers later were reattached.

9. *See Kimberlin v. DeLong,* 613 N.E.2d 46 (Ind. App.1993).

10. *See Kimberlin v. DeLong,* 637 N.E.2d 121, 128 (Ind.1994) (attached to Paper No. 12, Exhibit E).

11. *See Kimberlin v. United States,* Order of October 23, 1992, attached as Exhibit F to Paper No. 12. The Seventh Circuit found that Mrs. DeLong had a "final, collectible judgment" and that petitioner would have to launch any attack on that judgment in the Indiana courts. *Id.*

12. *See Kimberlin v. White,* 7 F.3d 527, 528–531 (6th Cir.1993) for a summary of parole proceedings. *See also* Paper No. 12, Exhibit G.

prefabricated housing project, a power plant project, a flower mill project, a tire contract and others) in Ukraine through a partnership known as LADA; entered into a recording contract; and entered into a book contract in favor of BKE, Inc., a corporation petitioner established and controlled.[13] The book contract, an agreement between BKE, Inc., writer Mark Singer, and Knopf Incorporated (a subsidiary of Random House), centered around allegations petitioner had made in the 1988 federal election campaign concerning his sale of marijuana to Dan Quayle, and petitioner's subsequent treatment by the Bureau of Prisons.[14] As of February 10, 1997 BKE, Inc. had received $339,000 in proceeds from that book, with another $225,000 in "guaranteed income" from the contract expected later that year. (*See* Paper No. 12, Exhibit H).

Despite a healthy income, petitioner continued to resist paying the DeLong judgment, which had been reinstated on June 13, 1994. In a July 12, 1994 letter to Probation Officer Koehler, he threatened to go into bankruptcy if enforcement of the judgment was to occur, and claimed that he was personally judgment-proof, with his assets and income protected under "corporate veil." (*See* Paper No. 12, Exhibit E and Exhibits I and J). Petitioner then proceeded with further unsuccessful appellate litigation attempting to set aside the judgment.[15] Following the Supreme Court's denial of *certiorari*, petitioner continued to ignore the outstanding judgment. On May 16, 1996 he submitted a mortgage loan application denying that he had any "outstanding judgments" against him.[16] A $308,000 mortgage loan was approved for the purchase of a house in Bethesda, Maryland.[17]

During this time, publicity connected to the release of petitioner's book, *Citizen K,* generated the attention of staff of the United States Senate Judiciary Committee. On October 11, 1996 the Committee's chief investigator informed the Commission's general counsel that *certiorari* in the DeLong matter had been denied by Supreme Court the previous year. The Commission in turn requested the United States Probation Office in Baltimore to review petitioner's financial circumstances and to provide the Commission with an opinion as to the probable enforceability of a special condition of parole requiring petitioner to satisfy the judgment.[18] In a January 8, 1997 interim report, Probation reported petitioner's statements that the bulk of his income had been derived from the book proceeds, and that a $100,000 payment from Knopf was imminent. Petitioner's January 28, 1997 letter detailing his financial position also was forwarded to the Commission.[19]

On February 10, 1997 the Commission imposed a special condition of parole ordering petitioner to "immediately undertake, in good faith and with all diligent effort, to pay the final civil judgment ..." in *Kimberlin v. DeLong.* Petitioner was further ordered to submit a payment plan for Commission approval and to take no measures to transfer or otherwise dispose of any assets owned or controlled by him without the permission of his probation officer. Because the Knopf payment was the only immediately available source of income or wealth, it was specifically identified, and petitioner was told to direct

13. *See* Paper No. 12, Exhibit H, letter of January 25, 1997 from petitioner to United States Probation Officer Renata Ramsburg.

14. Petitioner's treatment by the BOP is the subject of ongoing litigation. *See Kimberlin v. Quinlan,* 6 F.3d 789 (D.C.Cir.1993), *vacated and remanded,* 515 U.S. 321, 115 S.Ct. 2552, 132 L.Ed.2d 252 (1995).

15. Petitioner was denied rehearing by the Indiana Supreme Court on December 15, 1994. His petition for certiorari to the United States Supreme Court was denied October 2, 1995. See *Kimberlin v. DeLong,* 516 U.S. 829, 116 S.Ct. 98, 133 L.Ed.2d 53 (1995).

16. Petitioner claims he orally informed the loan officer about the civil judgment, but claimed that his lawyers had determined it to be void and unenforceable, and thus not subject to written disclosure. See paper No. 12, Exhibit W at 4–5.

17. LADA paid more than $100,000 for the down payment and mortgage payments on this house. *See* Paper No. 12, Exhibits K and Q.

18. *See* Paper No. 12, Exhibit M.

19. *Id.,* Exhibit H.

all future payments from Knopf, Inc. to Sandra DeLong. Petitioner additionally was prohibited from taking any action "that has the effect of delaying or otherwise frustrating the prompt satisfaction by you of any part of this special condition."[20]

Petitioner submitted objections and appealed the decision. On April 28, 1997 the Commission's National Appeal Board affirmed the decision to impose a special condition that petitioner pay the Indiana civil judgment.[21]

Rather than comply with the special condition, petitioner submitted a directive permitting Knopf to "deposit any monies which would otherwise be due me personally from Knopf (Random House) with Sandra DeLong."[22] On February 17, 1997 petitioner, who previously had claimed 100% ownership of BKE, Inc. on previous tax returns and appeared to control the corporation's accounts which he used for personal expenses, first claimed that BKE, Inc. was wholly owned by his sister.[23] Notwithstanding petitioner's January 25, 1997 claim that $225,000 in "guaranteed income" was due from Knopf, once the special condition was in place, nearly-concluded settlement agreements between Knopf and nine of petitioner's associates fell apart.[24]

Despite these maneuvers, Mrs. DeLong on April 18, 1997 obtained an order from the Marion County, Indiana Superior Court garnishing the Knopf book money in order to satisfy a judgment which by then amounted to $1,610,000 plus interest and costs.[25] The next day, petitioner notified Mrs. DeLong's counsel that he would go into bankruptcy unless she settled with him on his terms.[26] One week later Cynthia Kimberlin and her fiancé filed an involuntary bankruptcy proceeding against petitioner in the United States Bankruptcy Court for the District of Maryland.[27]

### The Parole Revocation Proceeding

On March 25, 1997 the Commission issued a summons that was served on petitioner on April 10, 1997, requiring his presence at a preliminary interview. Petitioner was charged with (1) submitting a fraudulent loan application by making a false statement as to a material fact when he denied having an outstanding judgments against him; and (2) noncompliance with the special payment condition. On April 25, 1997 petitioner attended a preliminary interview by Probation Officer Catherine J. Kirby. At that hearing petitioner denied the charges, claimed poverty and said he was trying to settle the matter with Sandra DeLong.[28] Officer Kirby concluded that petitioner had fraudulently con-

20. *Id.*, Exhibit N. In issuing this Notice of Action the Commission exercised its authority to waive the ten-day comment period that normally precedes imposition of a special condition, finding that petitioner already had made clear his "refusal to compensate [his] victim under any circumstances" and that such action necessary to prevent petitioner from having "any further time to spend or otherwise dispose of assets before [the] special condition takes effect." *Id.* Such waiver is permitted pursuant to 18 U.S.C. Section 4209(d)(1).

21. *Id.*, Exhibit O.

22. *Id.*, Exhibit P at 4–5. This directive was meaningless, because BKE, Inc., and not petitioner himself, was under contract with Knopf.

23. *Id.*, Exhibit Q, Financial Report of February 26, 1997. Although assets and income in excess of $350,000 have been donated or generated by petitioner for BKE, Inc., he claims to have transferred 100% of his ownership interest in the corporation to his sister in 1994 upon an alleged contribution of $150,000 by his sister, Cynthia Kimberlin, to BKE, Inc. No records have been

produced to verify this information. *Id.* at 9–10, n. 3.

24. These individuals had threatened libel actions against petitioner's co-author and Knopf in connection with the release of *Citizen K.* These claims prevented payment of any money from Knopf, Inc. to Mrs. DeLong or others, because Knopf had the contractual right to refuse payment until all claims against it are withdrawn or settled. *See, i.e., Kosior v. Ramsburg, et al.*, Civil Action No. AW–97–1511.

25. *See* Paper No. 12, Exhibit S.

26. *Id.*, Exhibit R.

27. It does not appear that these proceedings have been finalized. Questions may exist as to whether the requisite number of creditors signed the bankruptcy petition. *See* 11 U.S.C. Section 303.

28. Petitioner offered to pay $1,000 per month if he could take out a $20,000 home equity loan.

cealed from the mortgage company the true extent of his indebtedness and that he intended to "make sure that [Sandra DeLong] gets as little money as possible." Although finding probable cause on both charges, Officer Kirby recommended that petitioner remain on parole with strict monitoring pending a final revocation hearing, to see if he might begin to satisfy the special condition and demonstrate his rehabilitation. *See* Paper No. 12, Exhibit T.

On May 2, 1997 the Commission found probable cause on both charges and ordered a revocation hearing. In a letter to petitioner, the Commission outlined evidence it intended to consider at the hearing, including the recently commenced bankruptcy proceeding. The Commission permitted petitioner to remain on parole pending the hearing "to permit you to prepare for the hearing and to take the necessary steps to achieve full compliance with the special payment condition ..." The Commission informed petitioner that full compliance would require that he withdraw all legal obstacles created since February 10, 1997; obtain salaried gainful employment; submit a long-term payment plan to his probation officer; and ensure that his share of the book proceeds was delivered in full to Sandra DeLong prior to the revocation hearing. The Commission noted that it did not accept his claim of financial inability to hire counsel, based upon petitioner's hiring of private counsel engaged in New York and Indiana; his hiring of a personal assistant; his substantial material assets; and his partnership interest in LADA that had made the down payment and mortgage payments on petitioner's house.[29] During the 30–day period prior to the revocation hearing, petitioner did not attempt to comply with the conditions. Instead, on May 16, 1997, he filed an answer to the involuntary petition acquiescing in his sister's Chapter 7 bankruptcy filing. He also requested an indefinite postponement of the revocation hearing to obtain appointed counsel, a request that

was denied in a May 29, 1997 letter from the Commission.[30]

On June 6, 1997 the revocation hearing was convened at the United States Courthouse in Baltimore. Petitioner's witnesses included his mother and a friend, Julia Karamin. Probation Officer Ramsburg testified for the Commission.[31] Petitioner claimed that the February 10, 1997 Notice of Action had deprived him of all income, and he requested a continuance in order to obtain appointed counsel. He claimed that his mother had filed a $150,000 lien against his house, tying up its use as an asset. He also requested a continuance because various witnesses were not present, including his sister, mortgage loan officer Tim Rood, and his personal assistant Monika Kosior. Officer Ramsburg opposed the extension requests, testifying that by petitioner's previous statements he had recently received substantial income from LADA and $339,000 since 1993 on his book contract, with no documented explanation of where the money had gone. The examiner denied the continuance because it appeared petitioner had sufficient assets to hire counsel, and because petitioner admitted that he was given Form CJA–22 but did not submit it at or following the preliminary interview. *See* Paper No. 12, Exhibit V at 2–6.

Officer Ramsburg testified concerning her interviews with mortgage loan officer Rood concerning petitioner's failure to list the Indiana civil judgment on his mortgage application. By her testimony, Rood initially disclaimed having any knowledge of the judgment at the time the loan was made. After being interviewed by Ramsburg, Rood sent letters and spoke with petitioner alleging that he had been told about a judgment that petitioner had said was void and unenforceable. Petitioner testified that he did not conceal the judgment and believed that it no longer valid, and presented a letter from an attorney to support that claim. The examiner found the lawyer's letter to petitioner did

---

29. *Id.*, Exhibit U.

30. The letter indicated that petitioner had ample time to apply for appointed counsel, and had been provided with a CJA–22 Form at his hearing a month earlier. *Id.*, Exhibit V, letter dated

May 19, 1997 and Declaration of Catherine Kirby.

31. Petitioner had requested no adverse witnesses on a Form F–2.

not actually report the judgment to be void, and concluded that petitioner had fraudulently concealed a significant financial liability, either by failing to disclose it, or by providing false and misleading information regarding its validity. (*Id.*, Exhibit W at 7).[32]

Next, petitioner denied any attempt to avoid the special condition and offered to settle with Mrs. DeLong for $30,000. He further contested Officer Ramsburg's testimony concerning the sudden changes in his financial situation after the February 10, 1997 Notice of Action. The examiner found that petitioner used "deceitful maneuvers to hide his ability to pay" and that his "relatives and friends are obviously acting to help him by filing claims and liens to protect his money and property from being available to satisfy the victim's judgment." The examiner further found that the "evidence against [petitioner] was provided by the subject himself," and that at no time did petitioner "indicate any concern or empathy for the victim." Finally, the examiner found that petitioner's settlement offers were not undertaken in good faith; concluded that petitioner had resisted parole supervision by Officer Ramsburg "in every way he can," and recommended revocation of parole with a presumptive parole date of two years. *Id.*, Exhibit W at 11–14 and Exhibit V at 15. Petitioner was taken into custody at the conclusion of the hearing.

On June 27, 1997 the Commission adopted the examiner's recommendation, revoking pe-

titioner's parole and continuing him to a presumptive parole date of June 5, 1999.[33] *Id.*, Exhibit X.

Petitioner's administrative appeal, in which he raised substantially the same arguments raised in his federal habeas corpus petition, was denied by the Commission in a written decision on September 4, 1997. *Id.*, Exhibit Y.

### Analysis of Arguments Presented

*Validity of the Indiana Civil Judgment*

■ Petitioner first argues that parole revocation was improperly based upon his failure to pay a civil judgment which should be held void and unenforceable. Petitioner bases his claim upon the fact that the judge who presided over the jury trial that resulted in the judgment later was convicted of corruption.

Preliminarily, the Court notes that the judge in question was convicted not of soliciting bribes from parties in litigation, but of using a kick-back scheme involving judicial appointments and an insurance company.[34] Although petitioner claims that Judge Dugan solicited a bribe from him in the DeLong case and that he was instrumental in Dugan's conviction and sentencing, there is no evidence to support these claims.[35] Furthermore, any collateral attack would have to take place in the Indiana state courts and would require notice to the impacted party, Mrs. DeLong.[36] Although petitioner relies

**32.** In his "Traverse" (Paper No. 19), petitioner claims that the Commission used the wrong guidelines regarding the mortgage application. The Court finds that the guidelines used with regard to mortgage applications, set forth at 28 C.F.R. Section 2.20, were correctly applied here. Chapter 3, Subchapter B, Section 333 of those provisions deals specifically with fraudulent loan applications, which by regulations are quantified "according to the amount of the loan," and not the amount of the loss or expected loss.

**33.** The Commission found that "[a] substantial period of incarceration is appropriate because your administrative violation was an on-going series of false statements and actions intended to prevent the just compensation of the surviving victim of the extremely violent crime you committed. The purpose of parole is to achieve the rehabilitation of the offender, and you have demonstrated your fundamental unreadiness to work toward this goal." *Id.*, Exhibit X.

**34.** The details of the scheme can be found in *United States v. Dugan*, 902 F.2d 585 (7th Cir. 1990).

**35.** As respondent points out in its motion, even the statement by Kimberlin's former attorney is nothing more than an unverified handwritten statement which has never been authenticated by anyone other than petitioner. *See* Paper No. 12 at 19, n. 7.

**36.** In *Kimberlin v. United States*, 978 F.2d 1261 (7th Cir.1992), the Seventh Circuit held that because the Indiana civil case was still on appeal, the status of petitioner's rights in the matter had to be resolved by the Indiana courts. Five years has passed, and petitioner has yet to present his claim to the Indiana state courts. The doctrine of laches does not permit petitioner to withhold his claim from adjudication in the proper forum, and then demand that the Commission and this

upon *Bracy v. Gramley,* 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) to support his position, such reliance is misplaced. *Bracy* challenged the lawfulness of his criminal conviction. Here, rather than challenge his criminal conviction, petitioner challenges the civil judgment obtained by a victim.

In any event, the Commission itself is not obliged to entertain such an attempt to introduce and initiate a collateral attack upon a prior court judgment. *See Argro v. United States,* 505 F.2d 1374, 1376–77 (2d Cir.1974); *Bloodgood v. Garraghty,* 783 F.2d 470, 472 (4th Cir.1986) (legal sufficiency of prior conviction not subject to challenge at parole revocation proceeding); *see also Garcia v. Neagle,* 660 F.2d 983, 990 (4th Cir.1981) (where a prisoner had been held civilly liable for $600,000 in restitution, the Commission had sufficient evidence to support its evaluation of the gravity of petitioner's fraud offense).

*Validity of the Commission's Imposition of a Special Condition*

 The Commission has broad authority to impose any condition of parole that is reasonably related to the nature and circumstances of the offense and the history and characteristics of the parolee. *See* 18 U.S.C. Section 4209(a)(1) and (2) (1976). The conditions may be modified at any time, and such modification may be made immediately effective "to prevent harm to the parolee or the public." *Id.,* Section 4209(d)(1). A decision to impose a special condition of parole is committed to agency discretion, *see* 18 U.S.C. Section 4218(d) (1976), and must be upheld if the record reveals a "rational basis" to support it. *See Bagley v. Harvey,* 718 F.2d 921, 925 (9th Cir.1983).

██ Clearly a "rational basis" exists for requiring petitioner to pay a civil debt to his crime victim. Petitioner has a lengthy criminal history. Despite his high earnings, he failed to show any good faith by paying his crime victim.[37] To permit petitioner to profit from his crimes (by receiving royalties from book sales) without also requiring compensation to his victim would clearly promote public disrespect for the law, in violation of 18 U.S.C. Section 4206(1)(1) (1976).

██ At the time petitioner was paroled in February 1994, the Indiana civil judgment was on appeal[38] and petitioner had no known financial resources. Thus at that time, the conditions of parole did not require payment to Mrs. DeLong. (*See* Paper No. 12, Exhibit J). Petitioner now attempts to argue that the Commission is estopped from adding the special condition. Generally, however, some affirmative misconduct or action, coupled with injurious reliance by the individual, is needed before the doctrine of estoppel may be invoked against the government. *See Angeles v. District Director, INS,* 729 F.Supp. 479 (D.Md.1990); *see also Russie v. U.S. Department of Justice,* 708 F.2d 1445, 1448 (9th Cir.1983) (the doctrine of estoppel cannot be invoked to prohibit the Parole Commission from exercising jurisdiction, even if parolee is given erroneous information by his Probation Officer). Petitioner's letter to the contrary,[39] he has failed to demonstrate that he is entitled to the protection of the doctrine of estoppel.

Petitioner's claim of denial of due process likewise fails.[40] Although an ordinary debtor is entitled to due process before a creditor

---

Court simply accept his claim of judicial corruption as true. *See White v. Daniel,* 909 F.2d 99 (4th Cir.1990), *cert. denied,* 501 U.S. 1260, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991) (defense of laches available when party can show both lack of diligence in bring a timely claim and prejudice to the defendant).

**37.** The Indiana civil judgment does not amount to an "unrelated debt" exempt from the purpose of parole supervision. *See United States v. Abrar,* 58 F.3d 43 (2d Cir.1995) (disapproving a special condition of supervised release to pay all debts, whether related to the crime or not).

**38.** *See Kimberlin v. DeLong,* 613 N.E.2d 46 (Ind. App.1993).

**39.** *See* Paper No. 12, Exhibit I at 2, in which petitioner warns his probation officer not to attempt enforcement of the Indiana judgment, and announcing his intent to continue appellate litigation.

**40.** Given the nature of litigation in the Indiana courts and beyond, it is hard to see where petitioner has been required to pay the Indiana judgment without the benefits of normal judicial process to contest Mrs. DeLong's right to collect.

may seize the debtor's property, petitioner is a parolee, and thus subject to conditions that restrict his activities "substantially beyond the ordinary restrictions imposed by law on an individual citizen." *See Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593; *see also Alonzo v. Rozanski,* 808 F.2d 637, 638 (7th Cir.1986). While petitioner may continue to raise procedural roadblocks to delay paying his crime victim, he may not do so while continuing to qualify for parole.[41] The special condition at issue here is in no way analogous to instances where parolees were required to give up professional licenses due to concerns for public safety.[42]

Furthermore, nothing in the Commission's regulations requires notice and a hearing before a special parole condition can be imposed. Petitioner's attempt "to expand the due process safeguards inherent in revocation proceedings to supervisory proceedings" must fail. *See United States ex rel. Vitoratos v. Campbell,* 410 F.Supp. 1208, 1212 (N.D.Ohio 1976). Similarly, the Commission's regulations do not require special proceedings before a condition requiring a payment plan is imposed.

In 1994, petitioner gave the Commission written and oral evidence of his intent to make himself "judgment proof" so as to resist paying the judgment. For that reason, the Commission had a rational basis for ordering the special condition to take immediate effect.

Nor has the special condition deprived petitioner of equal protection of the law in relation to all other civil creditors. The Commission has a legitimate state interest in treating paroled convicts differently from other citizens, and the special condition was rationally related to such interest. *See Moss v. Clark,* 886 F.2d 686, 690 (4th Cir.1989) (relaxed standard of scrutiny applies to equal protection claims by prisoners).

Nor did the special condition violate petitioner's First Amendment rights, in violation of *Simon & Schuster, Inc. v. NYS Crime*

*Victims Board,* 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). In that case, the Supreme Court held New York's "Son of Sam" law unconstitutional under the First Amendment, because it required that anyone who contracted with persons accused or convicted of a crime for the production of works describing the crime to pay all monies owed to the perpetrator to the crime victim instead. Here, the Commission, in an effort to further petitioner's rehabilitation and maintain public respect for the law, directed plaintiff to "immediately undertake, in good faith and with all diligent effort, to pay the final civil judgment . . ." in favor of Mrs. DeLong. The book money was but one of several resources from which the judgment could have been paid. Thus *Simon & Schuster, Inc.* does not apply to the facts presented here.

Petitioner also argues that the Commission has applied a restitution law against him, even though the law did not take effect under after he committed the crime upon which the Indiana civil judgment is based. However, changes in the parole guidelines interpreting the statutory criteria for parole release, as well as interpretations of the Commission's supervision statute, are not considered *ex post facto* laws. *See Franzese v. Clark,* 732 F.Supp. 653, 654 (E.D.Va.1990) (retroactive application of revised parole guidelines does not offend the *ex post facto* clause). Further, the restitution statute, 18 U.S.C. Section 3681, has not been cited by the Commission as its authority for the special condition of parole.[43] At the time of the bombing, 18 U.S.C. Section 4209 (1976) gave the Commission broad authority to impose those conditions of parole it found reasonable.

*Validity of the Parole revocation Hearing*

■ Petitioner's allegations of due process violations in connection with the revocation hearing likewise provide no basis for habeas corpus relief. The Commission gave facially valid reasons for its decision to revoke petitioner's parole. Thus petitioner's claim that

---

**41.** This "carrot and stick" approach has been upheld even where constitutional interests, such as the right to refuse psychotropic medication, were involved. *See Rauschenberg v. Williamson,* 785 F.2d 985, 987 (11th Cir.1986).

**42.** *See, i.e., United States v. Pastore,* 537 F.2d 675, 683 (2d Cir.1976).

**43.** *See* (Paper No. 12, Exhibit Y at 1).

revocation was politically motivated or vindictive provides no basis for relief.[44] The congressional attention directed at petitioner occurred only after petitioner himself sought publicity in connection with publication of his book, *Citizen K.*

Furthermore, the hearing officer at the revocation hearing was neither the parole officer who made a report of parole violation, nor the officer who recommended the commencement of parole revocation proceedings. Thus the hearing officer was sufficiently neutral and detached to conduct the hearing. *See Morrissey v. Brewer,* 408 U.S. 471, 486, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Petitioner claims the preliminary hearing officer and the final hearing examiner were biased and somehow acting upon instructions.[45] The documentary evidence, however, shows that both exercised reasoned judgment in reaching their conclusions. Nothing in the record suggests that their conduct deprived the hearings of the fairness and impartiality required by due process. *See NLRB v. Webb Ford, Inc.,* 689 F.2d 733, 737 (7th Cir.1982); *Tele–Trip Co. v. NLRB,* 340 F.2d 575, 581 (4th Cir.1965).

Petitioner's contention to the contrary, the Commission did not change the mortgage fraud allegation between the time of initial interview and the final decision. (*See* Paper No. 12, Exhibits T and X). Furthermore, case law and agency regulations do not require disclosure of evidence against a parolee within a certain deadline, but merely that the parolee be advised of the evidence against him.[46] Such disclosure occurred here.[47] (*Id.,* Exhibits U and Y).

At his preliminary hearing, petitioner had an opportunity to request any adverse witness he wished to appear at his final revocation hearing. Petitioner did not request any adverse witnesses.[48] (*id.,* Exhibit T at 8). Only upon arrival at the revocation hearing did he complain that one adverse witness, mortgage officer Tim Rood, and two witnesses in his favor, Cynthia Kimberlin and Monika Kosior (his sister and personal assistant, respectively) were not present. Although petitioner cites *Belk v. Purkett,*[49] 15 F.3d 803 (8th Cir.1994) to support his contention that an accused parole violator does not need to request the presence of adverse witnesses for a final revocation hearing, his reliance is misplaced here, inasmuch as federal Parole authorities are not required to produce adverse witnesses unless the parolee makes his wishes known by executing the form provided to him at the preliminary interview. *See Ball v. U.S. Parole Commission,* 849 F.Supp. 328 (M.D.Pa.1994). Petitioner has made no showing of specific prejudice caused by the absence of these witnesses. Because prejudice cannot be inferred in each instance of a missing witness, *see (Hanahan v. Luther,* 693 F.2d at 635–636), petitioner will not be afforded relief based upon this unsupported allegation.

### The Validity of the Commission's Actions in Light of Petitioner's Bankruptcy Proceedings

Petitioner claims that parole revocation violates the automatic stay provisions of

---

**44.** *See Bloodgood v. Garraghty,* 783 F.2d 470, 475 (4th Cir.1986) (where valid reasons given for decision, federal court cannot assume parole board relied on possibly invalid factors).

**45.** Petitioner's claim that Ms. Kirby described herself as "a puppet" is not supported by the record.

**46.** *See Morrissey v. Brewer,* 408 U.S. at 489, 92 S.Ct. 2593; 18 U.S.C. Section 4214(a)(2)(D) (1976).

**47.** Indeed, much of the evidence used against petitioner was based on his own submissions to parole officials. He thus cannot complaint that his own voluntary submissions provided evidence that he violated parole. *See Hanahan v. Luther,* 693 F.2d 629 (7th Cir.1982), *cert. denied,* 459

U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1013 (1983).

**48.** The rules of the Commission permit issuance of a subpoena to secure the presence of even favorable witnesses who might otherwise not appear. *See* 28 C.F.R. Section 2.51(a)(2).

**49.** In *Belk,* a case involving parole revocation by the Missouri State Parole Board, the Eighth Circuit Court of Appeals held that adverse witnesses must be produced unless "good cause" is found for not allowing cross-examination. In *Belk,* there is no indication that the state parole board ever gave an accused parole violator a formal opportunity to request or waive the appearance of adverse witnesses. Such an opportunity is provided to federal parole violators.

the Bankruptcy Code. *See* 11 U.S.C. Section 362. As this Court noted in *Kimberlin v. United States Parole Commission*, Civil Action No. AW–96–1687, neither the habeas corpus statute nor the automatic stay provisions of the bankruptcy code "contemplates [use of the bankruptcy stay for habeas corpus] relief." Indeed, Section 362(b) of the Bankruptcy Code indicates that "[t]he filing of a [bankruptcy petition] under section 301, 302, or 303 of this title . . . does not operate as a stay—

> (1) under subsection (a) of this section, of the commencement or continuation of a criminal action or proceeding against the debtor . . . .
>
> (4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power . . . . [and]
>
> (5) under subsection (a)(2) of this section, of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power."

Case law also holds that the automatic stay does not prevent parole revocation proceedings. *See Birk v. Simmons*, 108 B.R. 657, 659 (Bankr.S.D.Ill.1988) (automatic stay did not bar revocation hearing based on debtor's failure to pay restitution obligation imposed as a special condition of probation); *Gilliam v. Metropolitan Government of Nashville*, 67 B.R. 83, 87 (Bankr.M.D.Tenn.1986) (automatic stay did not bar revocation hearing based on debtor's failure to pay fine and court costs as special condition of probation); *see also Hucke v. Oregon*, 992 F.2d 950 (9th Cir.1993), *cert. denied*, 510 U.S. 862, 114 S.Ct. 178, 126 L.Ed.2d 137 (1993) (probation revocation hearing begun after filing of bankruptcy petition and based on debtor's attempt to discharge restitution payments did not violate automatic stay).[50]

The revocation proceedings were based upon petitioner's lack of rehabilitation

through his acceptance of responsibility for his crimes and sincere attempts to make amends to his victim. It was not undertaken solely as a collection action to benefit the DeLong family. Petitioner's reliance on the automatic stay as a ground for habeas corpus relief is misplaced.

Furthermore, it does not appear that there has been an actual settlement in the civil judgment obtained by Mrs. DeLong or that the bankruptcy proceedings have been concluded. In any event, such matters are between petitioner and other parties, not the Commission, and have little impact on the reasons for parole revocation proceedings that concluded prior to negotiation of such settlement.

### *Denial of Appointment of Counsel*

■ Under 18 U.S.C. Section 4214 a parolee is to be appointed counsel if he is financially unable to retain counsel prior to revocation proceedings. The proper time for a parolee to apply for counsel is at the preliminary interview stage of proceedings. *See* 28 C.F.R. Section 2.48(b). At his preliminary interview, petitioner was given Form CJA–22 (for appointment of counsel), which he chose not to submit. Although he continued to request postponements from the Commission in order to apply for appointed counsel, he continued to submit the required application (or its functional equivalent). Given the evidence submitted by petitioner concerning monies obtained from LADA, his inheritance, and the book contract, as well as information that petitioner had hired attorneys in Maryland, Indiana and New York in the recent past, the Commission properly held that petitioner was not entitled to appointed counsel.

### Conclusion

For all of the reasons set forth herein, the undersigned shall deny petitioner's habeas corpus petition, with prejudice, and direct the Clerk of Court to close this case.

---

**50.** In *In re Barboza*, 211 B.R. 450 (Bankr.D.R.I. 1997), the bankruptcy court held that a violation of the automatic stay may be found, if the sole objective of the debtor's post-bankruptcy petition probation hearing is to collect restitution. As noted herein, the facts of *Barboza* are not present here.

***AMENDED ORDER***

In accordance with the foregoing Memorandum, **IT IS** this 30th day of June 1998 by this Court hereby **ORDERED:**

1. That this Order, together with the foregoing Memorandum, **SHALL AMEND** the May 20, 1998 Memorandum and Order in this case;

2. That the Warden of FCI–Petersburg **IS SUBSTITUTED AS RESPONDENT** in this action;

3. That petitioner's petition for habeas corpus relief (Paper No. 1) **IS DENIED;**

4. That petitioner's Traverse and Motion for Summary Judgment and Hearing (Paper No. 19) **IS DENIED;**

5. That the Clerk of Court **CLOSE** this case; and

6. That the Clerk of Court **MAIL** a copy of this Order, together with the foregoing Memorandum, to petitioner and to Assistant United States Attorney Tamara Fine.